[No. S041630. Jan. 23, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILLIP CARL JABLONSKI, Defendant and Appellant.

778

COUNSEL

Mark D. Greenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Bruce Ortega and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORENO, J.**—A jury convicted defendant Phillip Carl Jablonski of the first degree murders of Carol Spadoni and Eva Petersen. (Pen. Code, § 187.)[1] The jury also found true the special circumstance allegations that defendant murdered Petersen while engaged in the commission or attempted commission of rape (§ 190.2, subd. (a)(17)(C)) and sodomy (§ 190.2, subd. (a)(17)(D)). Additionally, the jury found true prior-murder and multiple-murder special-circumstance allegations (§ 190.2, subd. (a)(2), (3)). After a sanity trial at which the jury found that defendant was sane at the time of the commission of the offenses, the jury proceeded to the penalty phase and ultimately returned a death verdict as to each count. The trial court declined to modify the verdict (§ 190.4, subd. (e)), and sentenced defendant to death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We affirm.

## I. FACTS

### A. *Procedural History*

On June 14, 1991, defendant was charged by indictment with the murders of Carol Spadoni and Eva Petersen (§ 187) with the special circumstances that

---

[1] All further unspecified statutory references are to the Penal Code.

the murder of Petersen occurred while defendant was engaged in the commission or attempted commission of rape and sodomy (§ 190.2, subd. (a)(17) (C), (D)), in addition to prior-murder and multiple-murder special circumstances (§ 190.2, subd. (a)(2), (3)). It was further alleged that defendant had personally used a firearm in the commission of the offenses (§ 12022.5). Defendant was also alleged to have suffered prior serious felony convictions and to have served prior prison terms (§§ 667, subd. (a)(1), 667.5, subd. (b)).[2]

On September 25, 1991, the trial court entered a plea of not guilty and a denial of all special allegations on defendant's behalf pursuant to section 1024. Subsequently, defendant also pled not guilty by reason of insanity.

On June 3, 1993, criminal proceedings were suspended to determine whether defendant was competent to stand trial (§ 1368). On November 10, 1993, a jury found defendant competent and criminal proceedings were reinstated.

On January 25, 1994, jury selection began for defendant's criminal trial and, on April 25, the jury convicted defendant of both counts of first degree murder and found true all special allegations except the prior-murder special circumstance, which, in a bifurcated proceeding, was found true on April 26. On May 2, the sanity phase commenced and, on May 10, the jury found that defendant was sane at the time of the commission of the murders. On May 17, the penalty phase commenced and, on June 17, the jury returned death verdicts.

On August 12, 1994, the trial court denied defendant's automatic motion for reduction of the death verdict and modification of the verdict. (§ 190.4, subd. (e).) Defendant was sentenced to death on each count of murder. He was also sentenced to five years on each firearm use enhancement, but those sentences were stayed pending execution of the death sentences.

B. *Guilt Phase Evidence*

1. *Events Leading up to the Spadoni-Petersen Murders*

In April 1991, Carol Spadoni lived with her mother Eva Petersen on Sanchez Street in Burlingame, in San Mateo County. Spadoni was defendant's wife. Their relationship had begun when Spadoni answered a personal ad defendant had placed in a newspaper. They were married in 1982 at San

---

[2] The prior conviction and prior prison term allegations were ultimately stricken at the People's request.

Quentin where defendant was an inmate. Eventually, Spadoni wanted to end her relationship with defendant whom she described to a friend as "weird." She told the same friend she was afraid of defendant.

In the summer of 1990, Petersen telephoned Richard Muniz in Sacramento. Muniz was a prison friend of defendant and through defendant had met Petersen and Spadoni. After his release from prison, Muniz maintained a friendship with the two women. Petersen asked Muniz to come to her house in Burlingame and pick up some belongings that defendant had sent to the women in anticipation of his release on parole. Petersen told Muniz she did not want defendant on her property because she was afraid of him and afraid that he might harm her. Muniz took the items and stored them in his own garage.

Around the same time, Spadoni talked to Robert Paredes, who became defendant's parole officer. Paredes was assigned to the Indio office in Riverside County. Defendant had asked to be allowed to live with Spadoni in Burlingame, but when Paredes informed Spadoni of this, she told Paredes she did not want defendant living with her because she was afraid of him.

When defendant was released from the state prison at Vacaville in September 1990, Muniz picked him up. Muniz told him that Petersen had given Muniz the items defendant had sent to her and related Petersen's statements. Defendant spent the weekend with Muniz in Sacramento, and then Muniz put him on a bus to Southern California to meet Paredes in Indio. When Paredes met with defendant, he informed defendant of various parole conditions, among them that defendant was forbidden to travel more than 50 miles from his residence without Paredes's permission and was forbidden to go to Burlingame. Defendant was displeased about this latter condition.

Paredes also required defendant to participate in a counseling program because of his history of psychiatric problems. Defendant was eventually able to get into a program at the Loma Linda Veterans Administration (hereafter VA) hospital.

At Christmas, defendant asked Paredes for permission to go to Sacramento to visit Muniz and obtain a driver's license. Paredes gave him permission but only after he called Spadoni and informed her of defendant's request. She had no objection. Paredes told defendant not to go near San Mateo County. Defendant spent a week in Sacramento with Muniz. He complained to Muniz that Spadoni was listening to her mother and that Petersen was interfering with his plans to move to Sacramento where he felt there were more employment opportunities. Defendant seemed very upset about this situation. Muniz advised him to appeal his parole situation through the Department of Corrections.

Defendant returned from Sacramento with a driver's license and a 1965 Ford Fairlane. In January 1991, defendant enrolled in automotive classes at a local community college. While taking these classes, defendant befriended another student, Jim Lawrentz. Lawrentz testified that defendant tape-recorded class sessions. He described defendant as "very intelligent." Sometime around April 18, defendant ascertained from Lawrentz that he owned a small gun and offered to buy it from him. Initially, Lawrentz declined, but two days later he changed his mind and sold defendant his R.G. 14 revolver and bullets. Defendant was aware that he was not permitted to possess a gun because he was a convicted felon.

On April 22, defendant told his instructor, John Tamulonis, that he would not be in class the next day because he had a doctor's appointment, but would be in class the following evening. Tamulonis saw defendant again on the evening of April 22 with another student, Fathyma Vann. Defendant did not return for his evening class on April 23, nor did Tamulonis ever see him again.

## 2. *The Spadoni-Petersen Murders*

Robert Galindau was a friend of Carol Spadoni and Eva Petersen. He and the two women met for coffee and doughnuts three times a week at a doughnut shop. On April 24, 1991, after not having heard from the women for several days, Galindau telephoned them. Two days later, on April 26, he drove to their house on Sanchez Street. He noticed there were three or four days of newspapers in the yard and a couple of packages on the hood of one of the two cars parked in the driveway. He went around back and saw a cage containing cats. The cats had no food or water and did not look well. Believing something was wrong, Galindau notified police.

Burlingame Police Officer Frank Pickens arrived at the house around 7:20 a.m. There were newspapers and packages piled outside the house, and he heard dogs barking inside. He received no response when he knocked at the front door. He searched the house for signs of forced entry, but found none. He did, however, discover that a side door to the garage was unlocked. He entered the garage and saw that the door from the garage into the kitchen was open. The body of an elderly woman was lying on her back on the floor of the garage with her feet facing toward the kitchen. There was a gag in her mouth with what appeared to be a gunshot through it. Pickens and another officer entered the house together and found the body of a second woman who, like the first woman, had been gagged.

The first body found was that of Eva Petersen. A towel had been folded over and pushed into her mouth and a bullet had been shot through the towel.

Petersen was naked from her waist down; her sweatshirt and brassiere had been pulled up above her breasts and around her neck. There was another bullet hole above her right breast and a stab wound in her neck. There were also cuts around one of her nipples and around her right eye; the cut to her nipple could have been made with a knife, and the cut to her eye may also have been made by a knife. Blood smears on the kitchen floor indicated that she had been dragged across the kitchen. The stab wound to her throat had been made while she was still alive. The cause of death was the gunshot wounds to her head and chest.

The second victim was Carol Spadoni. Her body was found in the living room, dressed in a nightgown. Her nose and mouth were covered with duct tape wrapped so tightly it would have cut off her breathing except that she had been stabbed in the throat creating a functional tracheotomy. She had a bullet wound behind her right ear and three stab marks in her abdomen. Additionally, half of her right breast was sliced off, exposing a silicone implant. There were also stab wounds to her vagina, and her intestines were protruding from her anus as the result of a laceration. The cause of her death was the gunshot wound with the stab wounds and duct tape suffocation as contributing factors. Because decomposition had begun to set in, the pathologist who examined the bodies could not determine if any sexual assault had occurred.

A journal found on the kitchen table showed a final entry dated April 23, 1991. Envelopes addressed to the victims from defendant were found on the kitchen table and a letter addressed to "Mrs. Carol Jablonski" from defendant was found in a bedroom. A computer check revealed that defendant had received a traffic citation in Burlingame on the afternoon of April 23 for failing to yield the right-of-way. The officer who initiated the stop observed no signs of intoxication or nervousness during his brief encounter with defendant.

Police obtained a search warrant for Eva Petersen's bank records and discovered a check for $200 written to defendant and signed by Petersen. The signature on the check did not match Petersen's signature on her bank signature card. A teller at the bank in Millbrae where the check was cashed later identified defendant as the person who had cashed it on the afternoon of April 23. In addition to cashing the check, defendant also withdrew $500 from his own savings account.

Defendant was arrested in Kansas on April 28, 1991. In his wallet, police found $710, a $90 check drawn on Eva Petersen's bank account and credit cards in her name. A small address book was also found in defendant's wallet. It contained the names, address, and dates of birth of Eva Petersen and

Carol Spadoni. Beneath each name were the words "Death, April 23rd, 1991." The dates of the murders had not yet been made public.

A search of defendant's car revealed a loaded .22-caliber revolver beneath the driver's side seat, and a box of .22-caliber cartridges in the ashtray. Bullets removed from Eva Petersen's body matched the bullets in the revolver. The bullet recovered from Carol Spadoni's brain matched the rifling characteristics of the revolver, but the bullet was too damaged for a conclusive finding. Duct tape found in the vehicle was consistent with the duct tape used on Spadoni. Also recovered from defendant's car were homemade wire handcuffs and an electric taser. Police also found a knife sheath from which the knife was missing; the sheath tested presumptively positive for blood. A black leather belt was also recovered. On the back of the belt the names "Carol Jablonski 4-23-1991, Burlingame, California" and "Eva Petersen 4-23-1991, Burlingame, California" were written in ink. A handwriting expert determined that the writing on the belt was defendant's, as was the writing in the address book found in his wallet. Blue pants found in a travel bag were stained with semen and human blood.

Also found in defendant's vehicle was a tape recording in his voice in which he described arriving at the victims' residence, killing them, and sexually assaulting Eva Petersen. In the tape, defendant described shooting Spadoni through the brain, tying duct tape around her mouth and nose, stabbing her in the throat, slicing open her breast and stabbing "her ass and pussy." He also described shooting Petersen, fondling her breasts, sodomizing her, having sexual intercourse with her, and attempting to "take her eyes out." He also described stabbing her in her throat, and "in her stomach, ass and pussy." After he killed the women, defendant described moving their bodies, eating, showering, and shooting Petersen through a towel he had placed in her mouth.

### C. Sanity Phase Evidence

#### 1. Defense Evidence

Dr. H.R. Kormos, a psychiatrist, conducted eight interviews with defendant, beginning in March 1993 and continuing up to about a month before trial. During his examination of defendant, he observed that defendant talked to himself, drooled, exhibited facial muscle twitching, claimed that he heard voices and displayed a lack of affect and flat facial expressions. Defendant also complained he was experiencing flashbacks of traumatic experiences he had had as a solider in Vietnam. Kormos diagnosed defendant as schizophrenic. According to Kormos, defendant manifested all the symptoms of schizophrenia, which he testified are known as the "four A's": association,

affect, autism, and ambivalence. "Association" means "that the person is having trouble keeping their thoughts together in a logical fashion, and they continue to go off in different directions with the reason for their going off into these different directions not being very obvious to whatever witness is there." "Affect" means "mood." Kormos explained that, "in schizophrenia, with people having a flattened mood, there seems to be no change in their mood." "Autism" denotes "a person who is very much by themselves, and is not really linked with anyone else and, importantly, doesn't seem to be capable of linking up with anyone else." "Ambivalence" "indicates that the person . . . never seems to be clear about what they want or how they want to go about it, and that kind of ambivalence can be paralyzing."

Kormos testified that certain factors in defendant's childhood were relevant to his diagnosis that defendant suffered from schizophrenia. Statements made by defendant's sister indicated that defendant's father was violent toward both defendant's mother and defendant and that defendant had been sexually abused as a child.

Kormos also considered whether defendant suffered from posttraumatic stress disorder as a result of his experiences in Vietnam, but, because defendant's discharge papers did not indicate he had suffered any traumatic experiences while in Vietnam, he could not make this diagnosis.

He testified, however, that his diagnosis of schizophrenia was well supported by his conversations with other psychiatrists who had treated or observed defendant, and by Kormos's analysis of defendant's prior criminal acts and the circumstances of the charged offenses. Dr. Fleurant, the jail psychiatrist at the San Mateo jail, where defendant was housed, told Kormos that when defendant first arrived at the jail he seemed psychotic, unable to care for himself, and spouted gibberish. Fleurant ascribed these behaviors to schizophrenia and prescribed high doses of antipsychotic medication, which seemed to help. Kormos believed some of defendant's physical symptoms were consistent with the reactions of a schizophrenic to the medication. Kormos also spoke with Dr. Solon, a prison psychiatrist who had treated defendant while defendant was in prison for an earlier offense. Dr. Solon told Kormos he had no doubt defendant was suffering from schizophrenia and described an incident in which defendant came to him in a panicked and agitated state during which he was actively hallucinating.

A third psychiatrist, Dr. Roudebush, who was a staff psychiatrist at San Quentin, wrote in a 1982 report that defendant was a schizophrenic and attributed his sexual impulses to schizophrenia. At the time, defendant was in prison for murdering Linda Kimball, a woman with whom he had lived, and was about to marry Carol Spadoni. Roudebush told Kormos that defendant

had come to him and told him that, while massaging Spadoni's neck during a visit, he had been disturbed by "weird feelings" and an impulse to wrap Spadoni's hair around her neck. Kormos also reviewed a 1978 trial transcript from a civil trial in connection with Kimball's murder in which a Dr. Thompson testified that defendant was a schizophrenic who was psychotic at the time of the homicide and should have been hospitalized. He also reviewed reports from a psychiatric group that treated defendant between 1968 and 1972 and diagnosed him as schizophrenic. Finally, he cited a 1968 diagnosis of schizophrenia made at a VA hospital in Texas.

Kormos also testified about defendant's history of violence towards women. In 1968, defendant was hospitalized and given psychiatric treatment after an incident during which he became so enraged with his first wife that he nearly drowned her in the bathtub. He also exhibited other violent behavior towards her, including smothering her with a pillow during sexual intercourse. When Kormos discussed defendant's first wife with him, defendant complained that she was more involved in her profession as a dog trainer than in their marriage. Kormos believed this statement indicated an extreme sensitivity on defendant's part to female rejection that played a part in "disorganizing" defendant and causing him to function in an irrational manner. Kormos opined that the decision of the military to hospitalize defendant for the attempted drowning incident, rather than discipline him, indicated that defendant was "genuinely disturbed."

Defendant also engaged in violence against Jane S., the woman with whom he lived after his first marriage ended. Defendant raped her on their first date, but she nonetheless remained with him for four years. He also battered her and continued his predilection for smothering his partner during sexual intercourse. After Jane S. left defendant, he committed another rape. Kormos attributed the rape of Jane S. and the later rape to defendant's response to female rejection.

In 1978, defendant murdered Linda Kimball after she told him she was leaving him with their child. He told a Dr. Flanagan that he strangled and sexually assaulted Kimball because he did not "want to lose her." Kormos opined that by killing Kimball, defendant "took possession of her, and prevented her from being possessed by any other man." He described this as psychotic. Kormos commented that the fact there was no evidence of sexual assault, notwithstanding defendant's description of the murder, was a further indication of defendant's "tenuous hold on reality" on "matters of violence, homicide, sex and so on."

With respect to the current offenses, Kormos testified that defendant's primary purpose in killing and mutilating the victims was to express disdain

and contempt and to "seek[] revenge" on them and to "solve . . . his relationships with his mother and women in general." According to Kormos, defendant's intent was not so much to kill but "to destroy and to be totally in possession of" his victims. Kormos ultimately opined that defendant "was not able to distinguish right from wrong in relation to the acts that we're talking about." He stated: "The behavior that I understand that took place was behavior that was completely and totally dominated by this psychotic desire to destroy and possess and get back for [the] unbearable rejections that he feels he has had. [¶] And . . . this sexual organ mutilation that's going on, this general destruction and humiliation that he's involved in, this is beyond right or wrong, this is in furtherance only of some set of psychotic thoughts."

## 2. *Prosecution Evidence*

Vitali Rozynko, a clinical psychologist, was appointed by the court to examine defendant on the issue of legal sanity. He interviewed defendant on five occasions and conducted a review of extensive background material, including witness statements, statements by defendant's sister and Jane S., school and military records and various psychiatric examinations and treatments dating back to 1968. Rozynko agreed with Dr. Kormos that defendant suffered from chronic schizophrenia and, in addition, sexual sadism and mixed personality disorder. He also agreed that defendant was psychotic when he murdered Petersen and Spadoni. Rozynko concluded, however, that defendant was legally sane at the time he committed the instant offenses.

Rozynko's conclusion was based, in part, on his observations of defendant during his interviews with him. Defendant was oriented as to time and place and, while he looked terrible, as if he were "tremendously overmedicated," his answers to Rozynko's questions were "logical and relevant. His long term memory was pretty good, he remembered things very well. Although, at times he tended to contradict himself." Rozynko concluded that defendant had "very little insight" into why he had committed the crimes but also "that he really was only telling me what he felt he had to say, that he wasn't really telling me everything." Rozynko administered a Rorschach inkblot test to defendant and reviewed the results of a previous inkblot test supplied by defense counsel. While on the earlier test, defendant supplied unusual responses, the results of the test Rozynko administered to defendant revealed that, while he had poor impulse control and problems relating to people and dealing with anger, "he knew what other people knew was right and was wrong, he knew what was appropriate, and was able to conform to that." Rozynko concluded that defendant's control of his thoughts depended on stress. If the level of stress was high, he would have less control over his thoughts, but if things calmed down, he would be in control of his thoughts and able to respond like other people.

Rozynko explained that schizophrenia alone would not necessarily prevent someone from understanding the nature and quality of his acts, or knowing the difference between right and wrong, unless he was so delusional and disorganized in his thinking that "he cannot form an intention and literally cannot go across the room without being distracted, [then] we might talk about not knowing right from wrong." Rozynko testified that defendant was not suffering from such "severe delusions and severe disorganization" when he examined him nor, based on his review of materials relating to the murders, did he believe defendant was suffering from them at the time of the crimes. He described defendant's behavior at the time of the murders as "goal directed," indicating he was in touch with reality when he committed the crimes. Examples of this goal-directed behavior included defendant's acquisition of a gun before committing the murders, driving from Indio to Burlingame, equipping himself with homemade wire handcuffs, a taser, and extra clothing, and entering the victims' home surreptitiously. Additionally, after committing the crimes, defendant "took a shower, shaved, . . . went to a bank and cashed a check, then he drove to Utah." Rozynko commented, "if he was trying to getaway [*sic*], he certainly knew what he did was wrong." Rozynko concluded that there was no question in his mind that defendant knew that society disapproved of what he had done "and it was wrong."

Dr. George Wilkinson, a court-appointed psychiatrist, also interviewed defendant on five occasions and reviewed extensive background material. Wilkinson did not believe defendant was schizophrenic. Instead, Wilkinson diagnosed defendant as suffering from posttraumatic stress disorder, "transient" psychotic episodes triggered by "overpowering aggressive or sexual feelings" that "cannot be expressed," and had a passive/aggressive personality with "intense feelings of inadequacy" and was a sexual sadist. Wilkinson also concluded that defendant engaged in malingering behavior.

As evidence that defendant was not schizophrenic, Wilkinson observed that defendant's history did not show social isolation, a characteristic of schizophrenia. Defendant was able to befriend people, meet and establish relationships with women and had formed a close relationship with another inmate while he was in prison. Moreover, despite mental illness and periodic psychosis, defendant functioned well enough most of the time, also indicating that the diagnosis of schizophrenia was incorrect.

Wilkinson attributed defendant's posttraumatic stress disorder to his childhood and military experiences. He testified that this disorder could cause someone to have temporary episodes of psychosis. He explained that a "passive/aggressive" personality is a person who is not assertive and whose built-up aggressive energies are expressed passively. A sexual sadist is an individual who derives sexual pleasure from inflicting pain on an unwilling victim.

Wilkinson concluded that defendant also engaged in malingering, by which he meant that defendant exaggerated his symptoms in order to "fool" Wilkinson with the possible motive of saving his own life by presenting himself as insane. A series of psychiatric tests indicated to Wilkinson that it was "very, very likely that defendant was malingering." His conclusion was further supported by a statement made by defendant to another psychiatrist in connection with a 1972 rape charge. Defendant told the psychiatrist he had decided to plead not guilty by reason of insanity to the charge because he hoped to "beat the case" with a psychiatric defense.

Wilkinson testified that, based on his evaluation of over 300 murderers, defendant qualified as a serial killer. A serial killer is someone who has the need to kill repeatedly to release internal tensions. Defendant's behavior in making the tape recording of his crimes, inscribing the murders on his belt and writing the death dates of the victims beneath their names in his address book fit the pattern of a serial killer. Serial killers keep mementos or reminders of their crimes to help them relive the experience and "retouch some of the gratification that they gained by doing the acts." They also frequently use these mementos to enhance masturbation fantasies. Wilkinson testified that serial killer behavior might or might not be an indication of legal insanity.

Ultimately, Wilkinson opined that defendant understood the nature and quality of his conduct. He also concluded that defendant was aware of the difference between right and wrong at the time of the crimes. As evidence of this, Wilkinson pointed to defendant's awareness that he had to be alone when he confronted the victims and his flight after the crime. Moreover, there was nothing to indicate that, even though he knew his conduct was legally wrong, defendant believed he was morally justified in murdering the victims.

D. *Penalty Phase Evidence*

1. *Prosecution Evidence*

The prosecution presented extensive evidence of prior violent criminal conduct by defendant as well as evidence of two other murders defendant committed in the same timeframe as the charged offenses.

*a. Patsy Jablonski.* Patsy Jablonski, defendant's younger sister, testified that when she was 14 years old and he was 16 years old, defendant came up behind her, put a rope around her neck, threw her on the bed, and said, "I'm going to get some of that off of you." Defendant had an erection and she thought he was going to rape her. He suddenly stopped, apologized and began to cry. When she told their parents about the incident, their father beat defendant.

*b. Alice McGowan.* Alice McGowan was defendant's first wife; they had met in high school. After high school, defendant joined the military and was sent overseas. They married upon his return in 1968. McGowan lived for two months with defendant's parents in California until she joined him in Texas, where he was posted. In Texas, defendant became violent during sex. On one occasion, he put a pillow over her face while they were having intercourse and tried to suffocate her. On other occasions, he grabbed her throat and strangled her until she became unconscious. Once, he came into the bathroom while she was bathing and tried to drown her. On another occasion, while she was pregnant, he began to strangle her, until his mother convinced him to stop.

*c. Jane S.* After McGowan left defendant, he became involved with Jane S., whom he met in November 1968. On their first date, defendant raped her. She did not report the rape because she was afraid and ashamed. In July 1969, with Jane S. pregnant, defendant left the military and the couple relocated to California where, after living with his parents, they moved into their own house. Their sex life was marked by defendant's violent behavior. On one occasion, when they were having intercourse and Jane S. wanted to stop, defendant pulled out a pistol and threatened to shoot her if she did not continue. He struck her with the butt of the gun, rendering her unconscious and, when she came to, he was having sex with her. On another occasion, over her objection, he tied her to the bed while they were having sex and left her there. As with McGowan, he smothered her with a pillow rendering her unconscious during intercourse. She became afraid that, if he actually smothered her, their children would be left alone with him. She left defendant in 1972. Shortly before she left, defendant became angry at her and threw a frying pan filled with hot grease at her. The pan missed. She hit him with the pan, knocked him out, and fled with their children.

*d. Marsha S.* Marsha S. and her husband became acquainted with defendant when they obtained dogs from a company for which defendant worked that trained security guard dogs. Defendant had delivered the dogs to the S.'s and taught them how to handle them. On the evening of December 17, 1972, defendant came to their residence, even though Mr. S. had asked him not to, because he would be at work. Defendant and Marsha S. discussed problems with one of the dogs. Defendant told her to watch from the bedroom window while he worked with the dog outside. When she got to the bedroom defendant was not outside. Instead, he came up behind her, put a knife to her throat and ordered her to undress, threatening to kill her children unless she complied.

Defendant raped Marsha S. at knifepoint. During the rape he struck her face with the blunt end of the knife, fracturing her orbital bone. Later, with

her eight-month-old baby in the room, he tied her arms and sodomized her. Defendant told her his wife had just left him and he did not know why he was "doing" this but he had "already started" and she could "identify" him. The dog outside started barking, and defendant told her to bring the dog inside the house, threatening to kill her children if she did not return. She went outside and ran to a neighbor's house. The neighbor grabbed his gun and encountered defendant as he was coming out of the victim's house. The neighbor held defendant at gunpoint until the sheriff arrived. Upon being arrested, defendant told police, "I don't know why I did it," and "My wife just left me." Later, defendant told a detective that "I didn't know what I was doing at the time. Everything was blanked out for me and I just wasn't myself. I figure to myself[,] under a doctor's care and supervision that it would never happen again." The detective to whom he made these statements did not observe anything abnormal about defendant's mental functioning.

*e. Mary M.* Mary M. became acquainted with defendant through her participation in a letter-writing program to prisoners organized by her prayer group in Zionville, Indiana. She corresponded with defendant, who was in prison for the rape of Marsha S. After defendant was released, he invited Mary M. to come to visit him and she eventually agreed. She made it clear to defendant she was not coming to have sex. On the third day of her visit, defendant told her that because she was sincere about helping him, he was going to be honest with her. He then told her that a week before she arrived he had dug a grave for her, and offered to show her. She declined. He told her that he had planned to kill her but, because she was so sincere, had decided against going through with his plan. On the fourth day of her visit, defendant came into her room, woke her up and asked her to have sex with him. She refused. Eventually, to placate him, she let him tie her hands and feet with knitting yarn, thinking she could break the string if necessary. After he tied her up, he left the room and returned with a straight razor. She thought he was going to kill her. Instead, he shaved her pubic area. Afterwards, he took a photograph of the area. Then, he put a pillow over her face. She "played dead" and he stopped and left the room. The next day, on a pretext that there was an emergency at her daughter's home, she left.

*f. Isobel Pahls/Linda Kimball.* In February 1977, defendant met Linda Kimball and by August they were living together. Kimball gave birth to their daughter in December 1977. Kimball's mother, Isobel Pahls, lived nearby. On the evening of July 6, 1978, Pahls was awakened by defendant, who was on top of her, clad only in undershorts, holding a knife to her throat. He told her he had come to rape her but did not go through with it because when he looked at her face "all he could see was Linda's face." Pahls managed to escape to a neighbor's house. Pahls did not report the incident to the police out of concern for her daughter. Kimball promised that defendant would obtain treatment at the VA hospital at Loma Linda.

A few days after the incident, Kimball left defendant and she and their child moved in with Pahls. On July 16, about 11:00 a.m., Kimball returned to the apartment she had shared with defendant to pick up some things for the baby. Early that afternoon, Kimball's body was found at the apartment. Her wrists were bound. She had been beaten, stabbed and strangled with a man's belt. Her blouse had been pulled up and her pants and underwear pulled down. Her bra had been ripped apart. The cause of death was asphyxiation. Defendant was arrested in Arizona 11 days later. Police found a note in his handwriting that read, "Killed to date, Linda Kimball, commonlaw wife. I told her she would never raise Meghan alone or leave me alive. She begged me not to kill her. You screamed but it was cut short."

*g. Eileen Millsap.* After he killed Linda Kimball, but before he was arrested, defendant assaulted Eileen Millsap at her home in Highland, California. On the pretext of responding to an advertisement Millsap had put into a local paper offering a stove for sale, defendant came to her house while she was alone with her small children. He put a knife to the throat of her three-year-old son and forced her into the bedroom where he ordered her to undress. With her two children in the room, he got on top of her and began to choke her. She lost consciousness. When she woke up, defendant was gone. Her wallet and purse were missing. Defendant later used one of her credit cards to buy gasoline.

*h. Nettie Jablonski.* In July 1985, while defendant was incarcerated at the California Men's Colony, he attacked his mother while she and his father were on a 72-hour family visit. Defendant was angry because Carol Spadoni, whom he had married in 1982, had not come with his parents. He grabbed his mother, choked her, covered her mouth, and dragged her into the bedroom of the family visiting trailer. She yelled for help and his father came to his mother's aid.

*i. Fathyma Vann.* In April 1991, Fathyma Vann, also known as Fanny Hansen, was a fellow student with defendant in the automotive course at the College of the Desert. On Monday, April 22, defendant gave her a ride home from class. The next day, her body was found off the road in the desert outside of Indio. The cause of death was a gunshot wound but her body was mutilated. Stab wounds perforated her neck, abdomen, vagina and rectal area; her ears and nipples were amputated and there were wounds to her eyes. Abrasions on her back appeared to state "I love Jesus," with a heart-shaped incision in place of the word "love." The belt found in defendant's car after he was arrested for the Petersen-Spadoni murders, on which he had written their names and death dates, also contained the name "Fathyma N. Hansen, 4-22-91," and "Palm Desert." Her military identification was also found in

defendant's car. On the same tape on which defendant described the Petersen-Spadoni murders, he also described in graphic detail his sexual assault upon, and murder and mutilation of, Fathyma Vann.

*j. Yvette Shelby.* On April 25, 1991, while defendant was in flight after the Vann, Petersen and Spadoni murders, he stopped at a rest stop in Wyoming and brandished a gun at Yvette Shelby (also known as Yvette Russell) who had pulled into the rest stop to do some paperwork and let her dog out. Shelby was able to escape when defendant lost his grip on the gun and dropped it. She drove to the next truck stop where she called police. Police questioned defendant about the incident but he claimed the gun, which he carried for his protection, had fallen out of his car as he was getting out. The officer who questioned defendant accepted his explanation and let him go. At defendant's trial, however, the prosecution played the tape that was found in defendant's car in which he described seeing a woman and a child at a rest stop—the woman was apparently not Shelby, who did not have a child with her—and expressed his desire to rape and kill the woman. The purpose of playing the tape was to show defendant's criminal intent when he pointed the gun at Shelby.

*k. Margie Rogers.* Defendant's tape also narrated how he had shot an elderly woman working at a truck stop and then opened her blouse, pulled off her bra and fondled her breasts. The body of the victim, Margie Rogers, was found on April 27, at the convenience store/gas station where she worked. Her shirt had been opened and her brassiere was lifted over her breasts. She had been shot twice in the head.

### 2. *Defense Evidence*

Defendant's sister, Patsy, testified that their father was an abusive alcoholic who beat his wife and children. He called his wife and daughter "whores," and grabbed his daughters' breasts and those of their girlfriends. When he and his wife had sex, he would beat her or try to strangle or suffocate her. Defendant was the most frequently beaten child because he would try to come between his father and his mother to prevent him from hitting her. Defendant and his siblings often ran away and hid from their father; their mother would signal them when it was safe to return. The violence within the family was an almost daily occurrence and the police frequently were called to the house, but refused to intercede. Defendant's father was also cruel to animals. He always carried a gun with him that he would brandish at his children as he scolded them for their worthlessness, telling them they had not deserved to be born and did not deserve to live.

According to Patsy, defendant was sexually molested by a neighbor when he was four or five years old. The same neighbor molested her. She said two

neighborhood children, Dale and Janice Rearick, were present when the molestation occurred. Patsy described defendant as quiet. She and another brother, Albert, called defendant "Goody-Two-Shoes." However, defendant would take out his aggression on Patsy and Albert, and hit them when their parents were gone. Defendant would get upset when his parents were gone for a long time. He told Patsy, "They never loved me. They always hate me." He "cried about everything."

Defendant presented other witnesses who had known him and his family when he was a child. The Jablonskis were among the poorest of the poor in a lower middle class and poor neighborhood. The witnesses generally corroborated the portrait of defendant's father as a brutal, gun-carrying alcoholic who regularly abused his wife and his children and was cruel to animals. One witness testified that defendant's father was the meanest man he ever knew. Another witness testified that, when he was a child, defendant's father had run over his puppy and did not even bother to stop. He slaughtered chickens in a "sadistic" manner and once killed the family pet, a pig, for dinner. He also shot neighbors' cats if they strayed onto his property. A former daughter-in-law testified that defendant's father grabbed her month-old infant from her and fed the baby hot sauce. Witnesses remembered the Jablonksi children and sometimes their mother hiding from their father. Defendant would try to protect his mother and he would be beaten for it.

The defense witnesses also testified that as a child and teenager, defendant was a nice person who was quiet and kept to himself. The witnesses testified that defendant was a very anxious child. One witness testified he was "scared all the time." Other witnesses testified that he was a thin, pale, ill-looking and lonely child who cried all the time. However, one witness testified that he saw defendant and his sister Patsy have consensual sex on two occasions when they were teenagers. The two bragged about it and thought it was "funny."

In high school, defendant belonged to the cadet corps and in 1966 he enlisted in the army. His military records are unclear as to whether he served in Vietnam, but he claimed he had, and his discharge papers listed the Vietnam Service Medal. According to his first wife, Alice McGowan, when defendant returned from overseas to Fort Bliss, Texas, he was a changed man. Before, he had been a quiet person, but now he was "really mean" to McGowan and she "wasn't sure all the time whether he was really with it or not." During his relationship with Jane S., defendant was seeing VA psychiatrists and taking daily medication. However, he exhibited odd behavior, including forgetting his children at a shopping mall. Isobel Pahls testified that, after defendant attacked her, she called the Loma Linda VA and spoke to Dr. Kopiloff and reported the attack. Kopiloff told her not to call the police

and assured her that the VA would take care of defendant. She testified that her daughter, Linda Kimball, was upset because, on the Monday after the attack on Pahls, she had driven defendant to the Loma Linda VA hospital and hospital personnel had declined to hospitalize him. Two days before defendant killed her, Kimball took defendant to a second appointment at the VA hospital and hospital personnel again declined to hospitalize him. After Kimball's death, Pahls obtained custody of the child Kimball and defendant had had together. Defendant's parents also sought custody but, according to Pahls, the judge hearing the case said he would not send a child to the environment from which defendant had come.

In connection with defendant's release on parole in September 1990, the Department of Corrections prepared a release program study report in which it was noted that defendant was a "Category J" psychiatric inmate who received treatment, including medication. The report noted that a staff psychologist was concerned about defendant's parole and warned that, although in remission, he could become actively psychotic at any time. His original parole plan required him to seek mental health counseling. Ultimately, defendant sought such counseling from the Loma Linda VA hospital.

On November 30, 1990, Dr. Sylvia Winters, a psychiatrist at the VA hospital, conducted an intake examination of defendant. He told her that in the previous month and a half he had been hearing voices and seeing faces just as he had before he killed Linda Kimball. He reported that he had stopped taking the medication prescribed for him in prison. He complained that helicopters flying above the motel where he lived were making him nervous. He also told her he was having nightmares about a friend who had died in Vietnam in the crash of a helicopter on which defendant was a door gunner. He blamed having a flashback to his service in Vietnam for his attack on his mother at the California Men's Colony. He also blamed his experience in Vietnam for his murder of Linda Kimball, telling Dr. Winters that he "thought [his] wife was Vietnamese when [he] strangled her."

Dr. Winters was aware of the circumstances surrounding defendant's killing of Linda Kimball. She knew that, two days prior to the murder, defendant had been evaluated at the Loma Linda VA and found to be neither homicidal nor suicidal. Nonetheless, she accepted his assurance that he did not feel like hurting anyone and would inform his parole officer if he did. She tentatively diagnosed defendant as schizophrenic and made an additional, provisional diagnosis of posttraumatic stress disorder. She prescribed medications for him and referred him to a special posttraumatic stress disorder team at the hospital for combat veterans. She advised Nancy Whitney, a clinical social worker attached to the posttraumatic stress disorder team, that she might take some precaution for her security when defendant arrived for his

appointment. She also later wrote his parole officer and told him to be sure defendant did not sleep in the same room with others because of the possibility of Vietnam flashback. Whitney saw defendant for the next four months every two to three weeks. Her working diagnosis was posttraumatic stress syndrome. When she last saw him on April 4, 1991, he complained about an increase in his nightmares. A later search of his apartment revealed medicine bottles full of psychiatric medication, indicating that defendant was not properly taking his medication.

Rosser Donley, a classmate of defendant and Fathyma Vann, testified that on Monday, April 22, he and defendant were supposed to watch a videotape on alternators and generators after class ended that evening. The tape machine was not working, however, and defendant drove Donley to a restaurant, dropping him off about 7:30 p.m. Donley testified that had the machine not broken down, he would have been in the car with defendant and Vann. He opined, therefore, that defendant did not plan to murder Vann.

Alex Martinez, who had been an inmate with defendant at San Quentin, testified that when he and another inmate found two homemade prison knives in the chapel they took them to defendant, who worked as a clerk to the chaplain. Martinez and the other inmate had hesitated in turning in the knives because they knew that doing so might invite retaliation. Defendant, however, immediately and without hesitation turned them over to the chaplain.

### 3. Prosecution Rebuttal

Janice Rearick had grown up in defendant's neighborhood and knew his family. She had never seen defendant's father beat defendant or his sister, Patsy, although she heard screaming coming from the Jablonski house on occasion. She testified further that Harold Boies, who Patsy said had molested defendant, did not have a reputation as a child molester and, contrary to Patsy's testimony, she had not witnessed the incident of molestation described by her.

Albert Jablonski, defendant's younger brother, testified that defendant's father did not abuse him or defendant although he did use a belt on him as punishment. His father drank beer and was abusive toward his mother. Albert knew Harold Boies and testified that Boies never tried to molest him, nor had he heard that Boies had tried to molest defendant.

Janet Flenniken and her husband managed the hotel where defendant lived in the spring of 1991. Defendant acted like a normal person and never showed signs of being mentally ill. In March 1991, he said he had plans to move "up north." He told Flenniken he was going to get his wife to write a "lying letter" saying she would move with him to Sacramento and he would then start a new life.

Dr. Charles Sprague, a psychiatrist at the Loma Linda VA hospital, met with defendant in February 1991 for a medication check. Defendant said his mood was "okay," and Sprague's observations were consistent with this self-description. Defendant told Sprague he was not experiencing symptoms consistent with posttraumatic stress syndrome. He denied wanting to hurt anyone and reported no problems with anger or irritability. He claimed he was taking his medication as prescribed. Dr. Sprague had read Dr. Winters's report and had a "higher level of suspicion" than he ordinarily would have had in assessing defendant's dangerousness. Dr. Sprague looked for anything that might call for involuntary commitment, but found nothing to justify such action.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Presence of Unauthorized Individuals at Grand Jury Proceedings*

Present at some part of the grand jury proceedings that returned the indictment against defendant were several deputy district attorneys who were apparently observing the proceeding for training purposes. Subsequently, defendant moved to dismiss the indictment under section 995 alleging, as one ground of the motion, that the presence of these prosecutors violated section 939.

Section 939 provides in pertinent part: "No person other than those specified in Article 3 (commencing with Section 934), and in Sections 939.1, 939.11, and 939.21, and the officer having custody of a prisoner witness while the prisoner is testifying, is permitted to be present during the criminal sessions of the grand jury except the members and witnesses actually under examination." Although the district attorney is allowed to be present at grand jury proceedings to serve particular functions in aid of the proceedings (§ 935), the trial court agreed with defendant that the presence of deputy district attorneys who are not fulfilling this function was a violation of section 939. Nonetheless, the trial court concluded that defendant had failed to establish prejudice arising from the violation and dismissal of the indictment was not required.

On appeal, defendant contends the violation of section 939 amounted to a violation of his state and federal due process rights as well as the requirement in article I, section 14 of the state Constitution that felonies be prosecuted either by indictment or information and the Eighth Amendment's requirement of heightened scrutiny in capital cases. He further asserts that these violations constituted a structural error in the grand jury proceedings that requires reversal without reference to prejudice. We reject the argument.

■ Although section 939 does not preclude the presence of deputy district attorneys actively involved in assisting the district attorney in fulfilling his or her statutory function in grand jury proceedings (see *Stern v. Superior Court* (1947) 78 Cal.App.2d 9, 13 [77 P.2d 308], in this case, evidently, the deputy district attorneys were not rendering such assistance. We assume, therefore, that the trial court correctly concluded their presence was a technical violation of section 939. (See *People v. Superior Court (Mouchaourab)* (2000) 78 Cal.App.4th 403, 415 [2 Cal.Rptr.2d 829] ["Apart from necessary and authorized appearances, as specified by statute, no person is permitted to be present during criminal sessions of the grand jury except the members of the jury and witnesses actually under examination"].) Where, as here, irregularities in the grand jury proceedings are challenged on appeal, a showing of actual prejudice is required. (*People v. Towler* (1982) 31 Cal.3d 105, 123 [81 Cal.Rptr. 391, 641 P.2d 1253].) Thus, defendant must show the "alleged errors before the grand jury deprived him of a fair trial or otherwise resulted in any actual prejudice relating to his conviction" before reversal on the ground of such irregularity is warranted. (*Ibid.*)

Defendant asserts that the unauthorized presence of the deputy district attorneys had "an inherent tendency to be coercive and to compromise the grand jury's independence." This assertion, unsupported by any reference to the record, is purely speculative and fails to comport with *Towler*'s actual prejudice requirement. Undeterred, defendant argues that he is not required to show prejudice. In support of this claim, defendant relies on *Vasquez v. Hillery* (1986) 474 U.S. 254 [88 L.Ed.2d 598, 106 S.Ct. 617].

Under federal law, as under state law, irregularities in grand jury proceedings are generally subject to analysis for prejudice. (*Bank of Nova Scotia v. United States* (1988) 487 U.S. 250, 254–257 [101 L.Ed.2d 228, 108 S.Ct. 2369].) Nonetheless, the Supreme Court has acknowledged that there are "isolated exceptions to the harmless-error rule" involving cases where the error is of constitutional magnitude and "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." (*Id.* at pp. 256–257.) In *Vasquez*, racial discrimination in the composition of the jury that indicted the defendant led the court to reverse his conviction without reference to prejudice. (*Vasquez v. Hillery, supra,* 474 U.S. at pp. 263–264.) As the court subsequently explained, *Vasquez* exemplified the rare case where "[t]he nature of the violation allowed a presumption that the defendant was prejudiced, and any inquiry into harmless error would have required unguided speculation." (*Bank of Nova Scotia v. United States, supra,* 487 U.S. at p. 257; see *United States v. Mechanik* (1986) 475 U.S. 66, 70–71, fn. 1 [89 L.Ed.2d 50, 106 S.Ct. 938] [noting that the grounds for reversal in *Vasquez* "have little force outside the context of racial discrimination in the composition of the grand jury"].)

*Vasquez* is inapposite. The presence of unauthorized individuals at grand jury proceedings does not have a structural impact on those proceedings comparable to that of discriminatory selection of grand jurors, nor is such error insusceptible of review for actual prejudice such that prejudice must be presumed. (Cf. *Bank of Nova Scotia v. United States, supra,* 487 U.S. at pp. 257–260 [unauthorized presence of two Internal Revenue Service agents at grand jury proceeding was not prejudicial and did not warrant dismissal of indictment]; *United States v. Plesinski* (9th Cir. 1990) 912 F.2d 1033, 1038–1039 [presence of unauthorized special prosecutor was not prejudicial].) Accordingly, we reject defendant's claim that violation of section 939 resulted in any constitutional error, much less that automatic reversal of his conviction is warranted.

### 2. *Competency Trial Issues*

#### a. *Alleged Violation of Fifth and Sixth Amendment Rights by Requiring Defendant to Submit to Competency Examinations*

Prior to trial, defense counsel questioned defendant's competence to stand trial. The trial court, in accordance with section 1368, suspended criminal proceedings and appointed Dr. Alfred Fricke, a psychologist, and Dr. Jeffrey Weiner, a psychiatrist—Fricke to assess defendant's competence and Weiner to assess the effects on defendant of the psychotropic medications he was taking.[3] Over defendant's objections, the trial court also ordered him to submit to a competency examination by Dr. James Missett, who was retained by the prosecution.

A total of four experts testified at defendant's competency trial. The defense expert, Dr. Kormos, testified that defendant was suffering from schizophrenia and, as a result, was so impaired he was unable to assist rationally in his own defense. Kormos opined that defendant was not malingering. The two court-appointed experts, Drs. Fricke and Weiner, each testified that while they initially had believed that defendant was not competent to stand trial based on their first examinations of him, subsequent examinations changed their assessment. Dr. Fricke testified that, after his second examination of defendant, he concluded that defendant was competent to stand trial and that "without a doubt" defendant was malingering. Dr. Weiner testified that, after his subsequent examination of defendant, there was insufficient data as to whether defendant was competent. Weiner testified further that he had observed evidence that made him "strongly suspicious"

---

[3] Section 1368, subdivision (c) provides that "when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined."

that defendant was malingering. Finally, the prosecution's expert, Dr. Missett, testified that defendant was competent to stand trial and was malingering. The jury found defendant competent.

Defendant contends that the trial court violated his Fifth Amendment right against self-incrimination and his Sixth Amendment right to assistance of counsel by requiring him to submit to competency examinations by the two court appointed evaluators and by an evaluator designated by the prosecution. Alternatively, he contends that these rights were violated by requiring him to submit to examination by the prosecution's evaluator alone.

■ In general, the Fifth Amendment privilege against self-incrimination applies to competency examinations. (*Estelle v. Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866].) In California, the "protection . . . afforded by application of the Fifth Amendment is in fact provided by a judicially declared rule of immunity applicable to all persons whose competency to stand trial is determined at a section 1368 hearing." (*Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 496 [122 Cal.Rptr.2d 673].)

This rule of immunity was first declared in *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465 [122 Cal.Rptr. 61]. In that case, the Court of Appeal concluded that a psychiatrist appointed to examine a defendant for competency could not testify later on the question of defendant's sanity. The court reasoned that, because a defendant may not invoke his right against compelled self-incrimination in a competency examination, "neither the statements of [the defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [the defendant's] guilt, under either the plea of not guilty or that of not guilty by reason of insanity." (*Id.* at p. 470.) We adopted the judicially declared rule of immunity in *People v. Arcega* (1982) 32 Cal.3d 504, 522 [186 Cal.Rptr. 94, 651 P.2d 338] (see *People v. Weaver* (2001) 26 Cal.4th 876, 959–960 [111 Cal.Rptr.2d 2, 29 P.3d 103] [noting the rule in *Arcega*]).

Defendant argues that the immunity granted in *Arcega* inadequately protects a defendant's Fifth Amendment interest against self-incrimination because it does not prevent "nonevidentiary derivative uses" of statements obtained from a defendant during the competency examination. Such derivative uses, he postulates, might include "gain[ing] insight into the relationship between the defendant and his attorneys, or insight into tactical decisions or considerations by the defense, or a myriad of other articulable and inarticulable matters that . . . could be helpful to the opponent in dictating his choice of actions or tactics."

We reject defendant's argument for two reasons. First, the premise of defendant's claim—that the immunity conferred in *Arcega* is not coextensive

with Fifth Amendment protections—is wrong. From its inception, this immunity has applied to a defendant's statements to the competency evaluator and to any fruits of the mental competency examination. (*People v. Weaver, supra,* 26 Cal.4th at pp. 959–960; *People v. Arcega, supra,* 32 Cal.3d at p. 518 ["There is a rule of immunity for all statements and fruits of a mental competency examination which prevents their use at the guilt trial"]; *Tarantino v. Superior Court, supra,* 48 Cal.App.3d at p. 470.) "The judicially declared rule supplants the Fifth Amendment, because the scope of that rule is coextensive with the scope of the Fifth Amendment privilege." (*Baqleh v. Superior Court, supra,* 100 Cal.App.4th at p. 501.) Thus, the immunity granted in *Arcega* fully protects a defendant against any nonevidentiary uses of statements obtained from the defendant during the competency hearing to the same extent he or she is protected by the privilege against self-incrimination.

Second, defendant fails to demonstrate that, in this case, the immunity described in *Arcega* failed to fully protect his Fifth Amendment interests. His assertion that the prosecution may have gained some nonevidentiary insight into defense tactics via the competency examinations conducted by the court-appointed experts or the prosecution's expert is unsupported by citation to the record and exists only in the realm of speculation. Indeed, none of the experts who testified at the competency trial testified at any other phase of the trial, nor does it appear that their reports or observations were used by the prosecution at trial.[4]

Defendant's Sixth Amendment claim is equally unpersuasive. Preliminarily, we agree that "[t]he right to counsel clearly applies to the type of competency proceedings with which we are here concerned." (*Baqleh v. Superior Court, supra,* 100 Cal.App.4th at p. 503.) However, in this case, the record reveals that defendant was fully represented by counsel during the competency proceedings from the time that *defense* counsel first raised the issue of defendant's competency through the jury trial at which defendant was ultimately found to be competent. Indeed, as defendant's appellate counsel acknowledged during argument, defense counsel was even given the opportunity to be present at the examination of defendant by Dr. Missett, the prosecution's expert, but counsel declined. Moreover, although defendant adverts to a right to refuse to submit to a competency evaluation as part of his Sixth Amendment right to effective assistance of counsel, there is no indication on the record that he did so, even with respect to Dr. Missett. On

---

[4] This case does not present, nor do we consider, the question of whether a defendant's statements at a competency evaluation can be used for impeachment if the defendant subsequently testifies. (Compare *People v. Stanfill* (1986) 184 Cal.App.3d 577, 580–582 [229 Cal.Rptr. 215] with *People v. Harris* (1987) 192 Cal.App.3d 943, 949–950 [237 Cal.Rptr. 747].)

this record, therefore, we reject defendant's argument that he was denied his Sixth Amendment right to effective assistance of counsel to the extent that his claim is based on an assertion that he was denied counsel. Thus, this case is easily distinguishable from those decisions cited by defendant in which the reviewing court found a Sixth Amendment violation where, in essence, the defendants were allowed to represent themselves despite doubts regarding their competency. (*United States v. Klat* (D.C. Cir. 1998) 332 U.S. App.D.C. 230 [156 F.3d 1258]; *Appel v. Horn* (3d Cir. 2001) 250 F.3d 203.)

Defendant fares no better to the extent that his Sixth Amendment claim is based on the same ground as his Fifth Amendment claim—that the immunity described in *Arcega* was inadequate to protect against nonevidentiary uses of the competency evaluation by the prosecution. Defendant asserts that the possibility the prosecution may have gained some nonevidentiary advantage from its examination of defendant constituted an improper intrusion into the attorney-client relationship in violation of the Sixth Amendment. (*People v. Zapien* (1993) 4 Cal.4th 929, 1012 [17 Cal.Rptr.2d 122, 846 P.2d 704] ["A defendant's right to the assistance of counsel free from unreasonable government interference is protected by the Sixth Amendment"].) The predicates of this argument are that the immunity described in *Arcega* fails to protect a defendant against nonevidentiary uses of statements obtained during the competency evaluation, and that in this case the prosecution gained such advantage and exploited it. As we have already concluded, in rejecting defendant's Fifth Amendment argument, both predicates are false. For these reasons, then, we also reject defendant's Sixth Amendment claim.

Finally, defendant contends that, even if his Fifth and Sixth Amendment rights were not violated by compelled competency evaluations by the court-appointed experts, Drs. Fricke and Weiner, then, at minimum, these constitutional protections prohibited the competency evaluation by the prosecution's expert, Dr. Missett. We disagree. The constitutional interests are the same, whether the competency evaluation is undertaken by court-appointed experts or an expert retained by the prosecution, and those interests are adequately protected in either case by the immunity granted by *Arcega*. (*Baqleh v. Superior Court, supra,* 100 Cal.App.4th at pp. 502–503; but see *Bishop v. Caudill* (Ky. 2003) 118 S.W.3d 159, 163–164.) Here, moreover, Dr. Missett did not testify at either phase of defendant's trial, nor does defendant demonstrate that the prosecution made any use of Dr. Missett's testimony, report, or observations outside of the competency proceedings.

b. *Admission of the Kansas Tape*

Defendant contends that the trial court abused its discretion under Evidence Code section 352 and violated his due process rights by admitting at the

competency hearing, over his objection, the tape recording he made in which he described, in graphic and brutal detail, the string of murders he committed between April 22 and April 27, 1991. The tape had been seized upon defendant's arrest in Kansas.

Prior to his competency hearing, the defense moved to exclude the tape as more prejudicial than probative. (Evid. Code, § 352.) In opposition, the prosecution argued that the tape was relevant to its theory that defendant was malingering to avoid punishment for his crimes. As the prosecutor explained, the portrait of defendant painted for purposes of the competency hearing was that he "speaks gibberish, . . . cannot remember the names of three simple objects. That his memory is barely intact. In other words, an extremely low level of functioning." The tape, however, in the prosecutor's estimation, supported the prosecution's theory that defendant was feigning his mental illness to avoid the death penalty because "it demonstrates that this defendant has a remarkable memory for detail, remembering things that occurred over the last four days in chronological sequence, in rich detail. [¶] So it shows no memory problems. It shows a person who's not stumbling over his words. Who is not, as Dr. Fricke in his report says, stumbling and barely able to concentrate. It shows a person whose concentration is good. [¶] For those reasons I think the jury is entitled to hear it so they can compare that with the level of functioning that he experiences now." The trial court agreed that the tape was "highly probative and directly relevant to the issue of whether the defendant is feigning incompetence now to avoid a trial and possible punishment." Accordingly, the court admitted the tape.

■ "[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations]. Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' (*People v. Alvarez* [(1996)] 14 Cal.4th [155], 204, fn. 14 [58 Cal.Rptr.2d 385, 926 P.2d 365])." (*People v. Waidla* (2000) 22 Cal.4th 690, 724 [94 Cal.Rptr.2d 396, 996 P.2d 46].) "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 [89 Cal.Rptr.2d 847, 986 P.2d 182].) We conclude that the trial court did not abuse its discretion by admitting the tape, nor did the admission of the tape violate due process.

■ The question in a competency proceeding is whether, "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the

conduct of a defense in a rational manner." (§ 1367, subd. (a).) Defendant acknowledges that the Kansas tape, even though it was made two years before his competency trial, to the extent it established a rational capacity to recall and communicate, had some relevance on the issue of his present competence to stand trial. (Cf. *People v. Samuel* (1981) 29 Cal.3d 489, 504 [174 Cal.Rptr. 684, 629 P.2d 485] [defendant's confession, obtained one year before competency proceeding, had some probative value in determining his present competency but, in relation to other evidence, was not "highly probative" and reversal of competency finding was required].)

Nonetheless, he maintains the evidence should have been excluded because its probative value was weak in comparison with its potential to prejudice the jury against him. In this connection, he argues that the tape was cumulative of other, far less sensational evidence that would also have established his capacity for rational behavior. Specifically, he points out that Dr. Missett's report listed a number of reasons for his conclusion that defendant was competent to stand trial, including past evidence of rational behavior that did not involve criminal conduct. In addition, defendant notes, the trial court was aware of the proposed testimony of percipient witnesses to defendant's behavior in the period between his release from prison and commission of the crimes, which would have made the same point regarding defendant's ability to function as the prosecution sought to make with the tape recording.

We do not agree that the tape recording was cumulative to the testimony of other witnesses regarding defendant's capacity to act rationally. The tape, in defendant's own voice, sequentially recounting the circumstances of his crimes in great detail when he had no motive to feign mental illness, was not only highly probative of whether he was malingering but also uniquely probative in a way that neither Dr. Missett's report nor the testimony of other witnesses could be. We conclude, therefore, that the trial court did not abuse its discretion by admitting the tape recording.

Defendant argues, however, that the effect of the evidence was to invoke an emotional bias against him on the part of the jury that impelled the jury to punish defendant, presumably by finding him competent. As the Attorney General points out, the jury was instructed that its sole function was to determine defendant's competence to stand trial, not whether he was guilty of a crime; apprised that it was not to consider the consequences of a finding either of competence or incompetence in rendering its verdict; and admonished that it was not to be influenced by pity for defendant or prejudice against him, nor by sentiment, conjecture, sympathy, passion, prejudice, public feeling or public opinion. Defendant asks us to presume that the tape recording evidence rendered the jury incapable of following these instructions but, absent some indication in the record, we must presume that the jury

understood and applied these instructions. (*People v. Frank* (1990) 51 Cal.3d 718, 728 [274 Cal.Rptr. 372, 798 P.2d 1215].)

In short, we conclude the trial court did not abuse its discretion under Evidence Code section 352. We conclude further that the admission of the evidence did not violate defendant's due process rights by rendering the trial fundamentally unfair. (*People v. Falsetta, supra,* 21 Cal.4th at p. 913.)

### c. *Failure to Discharge Juror*

Defendant contends that the trial court abused its discretion by failing to discharge a juror who informed the court that she had received a telephone call from someone whose voice she did not recognize, but who identified himself as "Carl." The juror explained that the only reason she brought the matter to the court's attention was her concern about whether defendant—whose middle name is Carl—had access to her telephone number. Upon being assured by the court that defendant did not have such access, she agreed that the call was likely a "crank call." When asked by the court whether she was confident she could be a fair and impartial juror, the juror answered affirmatively. After the juror left the courtroom, the defense requested that she be discharged. The request was denied.

Section 1089 provides in part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged . . . ." "Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence. [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 659 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Farnam* (2002) 28 Cal.4th 107, 141 [121 Cal.Rptr.2d 106, 47 P.3d 988].) The record before us does not show that the juror was unable to fulfill her functions as a demonstrable reality. Accordingly, we find no abuse of discretion in the trial court's decision to retain the juror.

### d. *Competency Standard*

Defendant contends that California's standard for competence, as embodied by CALJIC No. 4.10, fails to meet the standard articulated for federal due process purposes in *Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 80 S.Ct. 788]. In *Dusky,* the court stated that the test of a

defendant's competency to stand trial is whether the defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him.' " (*Ibid.*) Consistent with CALJIC No. 4.10, the jury was instructed that "a person charged with a criminal offense is deemed mentally competent to be tried for the crime charged against him, if [¶] 1. He is capable of understanding the nature and purpose of the proceedings against him; [¶] 2. He comprehends his own status and condition in reference to such proceedings; and [¶] 3. He is able to assist his attorney in conducting his defense in a rational manner."

Defendant maintains that a person who "is able *to assist* an attorney in conducting his defense in a rational manner" does not necessarily have "sufficient present ability *to consult* with his lawyer with a reasonable degree of rational understanding" as required by *Dusky*. He asserts that, while "assisting" "demands only the minimal passive rationality required to answer an attorney's question" as to some aspect of the case, "consulting" denotes "an active participation and exchange between attorney and client rather than the passive assent of the client to the attorney's promptings." Thus, he argues that the capacity to consult "rationally imports a higher level of cognition and judgment" than that required to assist.

We have previously observed that the language of section 1367, from which CALJIC No. 4.10 is drawn, "does not match, word for word, that of *Dusky*. But as the Court of Appeal noted in *James H. v. Superior Court* (1978) 77 Cal.App.3d 169, 177 [143 Cal.Rptr. 398], 'To anyone but a hairsplitting semanticist, the two tests are identical.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 816 [42 Cal.Rptr.2d 543, 897 P.2d 481]; accord, *People v. Dunkle* (2005) 36 Cal.4th 861, 893 [32 Cal.Rptr.3d 23, 116 P.3d 494].) Indeed, as the Attorney General points out, the United States Supreme Court has itself used a formulation similar to California's to describe the standard of competency. (*Godinez v. Moran* (1993) 509 U.S. 389, 402 [125 L.Ed.2d 321, 113 S.Ct. 2680] ["Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to *assist* counsel" (italics added)].) We reject defendant's claim that California's formulation of the competency standard fails to comport with federal due process requirements.

### e. *Failure-to-recall Instruction*

At defendant's competency trial, all the experts agreed that defendant appeared to suffer from impaired memory. Therefore, at the prosecution's request, the jury was instructed: "The inability to recall facts or information does not in and of itself render a defendant incompetent to stand trial;

however, it is a factor to be considered in determining whether a defendant is incompetent to stand trial." Defendant contends the instruction was erroneous because it might have led the jury to disregard evidence of defendant's inability to recollect as proof that he was incompetent. We think not.

The source of the instruction was *People v. Amador* (1988) 200 Cal.App.3d 1449 [246 Cal.Rptr. 605]. In *Amador*, the court expressed doubts about the defendant's competence and appointed a psychologist to conduct a competency evaluation. The psychologist opined that the defendant was incompetent because he suffered permanent amnesia regarding the events surrounding the offense. The trial court concluded that amnesia did not, in and of itself, render the defendant legally incompetent to stand trial. On appeal, the Court of Appeal agreed. "The amnesic defendant is no worse off than the defendant who cannot remember where he was on a particular day because of the passage of time, or because he was drunk, drugged, unconscious or asleep at the time of the crime. Moreover, amnesia does not inhibit discussion between attorney and client as to tactical decisions concerning the trial. [Citation.] [¶] Amnesia as to the alleged offense does not totally incapacitate the defense and a defendant is still free to assist counsel in numerous other ways." (*Id.* at p. 1454.)

Regarding the propriety of the instruction, the Attorney General argues that if, in *Amador*, complete and permanent amnesia was found insufficient, by itself, to render the defendant incompetent to stand trial, a fortiori the mere inability to recall would not justify a finding of incompetence. Defendant contends that the instruction was incorrect because it may have led the jury to disregard evidence of failure to recall as proof of a mental disorder, like schizophrenia or posttraumatic stress disorder, that did render him incompetent.

To the extent that defendant is arguing that memory impairment, in and of itself, establishes a mental disorder that renders a defendant incompetent, we agree with *Amador* that such impairment does not, standing alone, establish incompetency. To the extent defendant is arguing that the instruction was inadequate because it did not specifically instruct the jury that impaired memory function could be evidence of a mental disorder that established incompetency, it was incumbent upon defendant to have requested elaboration or clarification of the instruction. (*People v. Dunkle, supra*, 36 Cal.4th at p. 894; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 122 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

In any event, there is no reasonable likelihood that a jury would have given the instruction the gloss placed on it by defendant. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475].) The instruction did not tell

the jury that the inability to recall cannot be considered in assessing competency, but only that it is not dispositive; indeed, the instruction states that the inability to recall "is a factor to be considered in determining whether a defendant is incompetent to stand trial."

### f. Cumulative Error

Defendant contends that the cumulative effect of errors at his competency trial requires reversal. However, because we have concluded that defendant failed to show any error at his competency trial, necessarily he cannot show cumulative prejudice arising from such error.

### B. Guilt Phase Issues

### 1. Admission of Defendant's Pretrial Statement

After his arrest, the police obtained a statement from defendant in intentional violation of his *Miranda* rights to use as impeachment evidence should he testify. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]; see *Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]; *People v. Peevy* (1998) 17 Cal.4th 1184 [73 Cal.Rptr.2d 865, 953 P.2d 1212].) Defendant contends that because the statement was involuntary, it should have been excluded for any purpose. Since defendant elected not to testify, we first address the question of whether he forfeited this claim. Assuming he did not, we conclude that, under the governing standard, the statement was not involuntary and exclusion was not required. Alternatively, we conclude that any error was harmless beyond a reasonable doubt.

### a. Background

Defendant was arrested in Kansas. On May 1, 1991, he was interrogated by Detective Barfknecht of the Riverside Sheriff's Department and Sergeant Haseleu of the Burlingame Police Department. Before beginning the interrogation, the officers agreed they would continue to question defendant, even if he invoked his *Miranda* rights, in order to obtain impeachment evidence should he testify, and to obtain investigative leads. The interrogation began about 10:30 a.m. and lasted until about 2:30 p.m., including a refreshment break and a lunch break.

During the course of the interrogation, defendant invoked his right to counsel 11 times. Defendant's first four invocations of his right to counsel came at the beginning of the interrogation. The first time he invoked his right to counsel was in response to Haseleu's statement, "We just want to go with you go with flow [*sic*] and kinda let you tell us, you know, what happened in

the last ten days or so, you know." Defendant responded, "I won't say anything until I see my lawyer." Haseleu responded, "that's obviously your right" but suggested that defendant "get some of this off your chest." Defendant replied, "Uh, I want to talk to him before I say anything." Haseleu then asked defendant if he knew Fathyma Vann and defendant declined to answer. When Barfknecht asked him if he took classes with her, defendant replied, "I said, I ain't gonna say anything until I talk to a lawyer." Haseleu replied, "Okay. We . . . understand that. Look you know . . . don't you feel that you could get this off your chest?" Defendant replied, "Not until I talk completely to a lawyer [to] see what he has to say."

Defendant next invoked his right to counsel when, after discussing his car trip from California to Kansas, Barfknecht again suggested he might want to "get it off your chest." Defendant responded, "I'd rather not say anything until I talk to a lawyer." Haseleu replied, "I understand that. You know, you've already said that on . . . the tape, and it's on there . . . We're not gonna try and do anything illegal to you, you know. I just you know, I would think if I was in your position I'd certainly like to get some of this stuff off my chest, so that I'd [feel] a little bit better anyway. . . . Maybe we can help you out . . . I got some people that would like to talk to you about some of your problems . . . ." Defendant replied, "I'd rather wait until I see an attorney . . . ." Haseleu told him, "Well, let me tell you my problem . . . okay? I'm . . . [from] Burlingame, okay? And uh, I need to know, you know, when the last time (inaudible) was. And if you know a few things that's gonna help me out . . . And I think that you owe it to the people at least let the other people know what happened there at the relatives. Don't you feel that way?" Defendant replied, "Like I said, I'd rather just talk to a lawyer and see what he has to say before I say anything."

The next two times defendant invoked his right to counsel were in response to attempts by the officers to elicit from him a description of the pressure defendant said had been building within him while he was living in Indio. To the officers' questions, defendant said, "I'd rather not until I talk to my lawyer about it" and "I'd rather talk to somebody. My lawyer before I say anything else on that." After the second try, Haseleu stated, "You know how this thing works . . . You know that we can't use any of this stuff against you in a court of law. This tape will never be heard by anybody except us. Matter of fact I'll turn the damn thing off if you want. I want to know what happened in my town. The relatives of these people want to know what happened in my town . . . . I'd sure appreciate it if you'd help me out a little bit here." Defendant replied, "Well, I gotta go stand trail [*sic*] there, so I, I'd rather wait and talk to uh lawyer." Finally, at the end of the interrogation, Haseleu asked defendant whether he would be willing to talk to a doctor, to which defendant replied, "I'd rather do that after I seen my lawyer and see what, what the complications of that would be, or have one present."

In addition to these invocations of his right to counsel, defendant declined to answer a number of questions during the course of the interrogation. For example, he declined to answer any questions about Fathyma Vann; to describe the flashbacks he said he suffered as a result of serving in Vietnam; to answer questions about when he had been in Burlingame and when he had left California; and to answer certain questions about Carol Spadoni. He also refused to answer some questions about his criminal history, his family background, why he had not used a credit card found in his possession (which, evidently belonged to Eva Petersen), the police stop in Wyoming, and about unspecified pressures he had been experiencing in California, whether something had "set him off," and whether he "want[ed] to get caught."

Defendant did, however, answer many other questions and converse with the detectives on a range of subjects including the route he had taken from California to Kansas, his financial situation, his relationships with women, including Spadoni, some details of his prior offenses, his life after his release from prison and his dissatisfaction with living in Indio. At one point defendant acknowledged he had "done wrong" in Burlingame and in Indio and, when asked what was going to happen to him, answered, "I'm going back to prison on life [*sic*] or deathrow, I don't know."

Before trial, defendant moved to prohibit any use of the statement because it was involuntary. The trial court agreed that some of defendant's statements were "involuntary and coerced" because of "promises and what I consider to be the exertion of an improper influence by the officers on" defendant. The court went on to note, however, that such involuntary statements must be "proximately caused by the promise, threat or exertion of improper influence." The court said it could not tell which statements were proximately caused by police misconduct and devised the following procedure: "If the defendant testifies and the District Attorney wishes to impeach him, the District Attorney will be ordered not to use any contents of that statement to impeach him before seeking permission to do so outside the presence of the jury. At that time, I will . . . determine whether or not the particular statement that the District Attorney intends to use was proximately caused by the promise or exertion of improper influence. Until that time, there's simply no way that I could know or anyone else could know which statements we'd be talking about." Defense counsel objected that this procedure "has an [e]ffect on our decisionary process on whether or not the defendant testifies." The prosecutor suggested that defendant could make an offer of proof as to his testimony for the prosecutor to determine which statements from the interrogation might be used for impeachment. The court replied it would be "open to that procedure if it becomes necessary." Ultimately, defendant did not testify at any phase of his trial, nor did the defense make an offer of proof as to his testimony.

### b. *Forfeiture*

The Attorney General argues that defendant forfeited his claim that the statement was involuntary by failing to secure a final ruling, either by testifying and obtaining specific rulings as to which, if any, of his statements could be used to impeach him, or by making an offer of proof. Defendant, on the other hand, contends that either requiring him to testify or make an offer of proof before obtaining a definitive ruling on the voluntariness of his statement itself impermissibly burdened his Fifth Amendment right against self-incrimination and his Sixth Amendment right to assistance of counsel.

The Attorney General acknowledges that the authority he cites in support of his forfeiture argument does not involve pretrial evidentiary rulings of constitutional dimension. (E.g., *Luce v. United States* (1984) 469 U.S. 38, 42 [83 L.Ed.2d 443, 105 S.Ct. 460] [denial of a motion to exclude a prior conviction offered for impeachment is not reviewable on appeal if the defendant fails to testify]; *People v. Collins* (1986) 42 Cal.3d 378, 383–385 [228 Cal.Rptr. 899, 722 P.2d 173] [adopting *Luce* rule]; *People v. Sims* (1993) 5 Cal.4th 405, 453–456 [20 Cal.Rptr.2d 537, 853 P.2d 992] [defendant's claim that the trial court erred in ruling that prosecution might be permitted to cross-examine him on unadjudicated murders should he testify at guilt phase forfeited by his failure to testify].)

By contrast, defendant points to *People v. Brown* (1996) 42 Cal.App.4th 461 [49 Cal.Rptr.2d 652] wherein the Court of Appeal held that a defendant had not forfeited his challenge to a statement assertedly obtained in violation of his Fifth and Sixth Amendment rights by his failure to have testified and subjected himself to impeachment with the statement. Rejecting the People's forfeiture claim, the Court of Appeal "conclude[d] that when the defendant raises a pure issue of law concerning a fundamental constitutional right, the defendant need not testify to preserve error in the trial court's rulings on impeaching evidence." (*Id.* at p. 471.) According to the Court of Appeal, its conclusion represented the majority of the jurisdictions that have considered the issue. (*Id.* at p. 469, fn. 4.)

Where, as here, the question of whether a defendant has preserved his or her right to raise an issue on appeal is a "close and difficult" one, we sometimes assume the issue has been preserved and proceed to the merits. (*People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93].) We apply that principle here and turn now to the voluntariness issue.

### c. *Voluntariness*

A statement is involuntary when "among other circumstances, it 'was " 'extracted by any sort of threats . . . , [or] obtained by any direct or implied

promises, however slight . . . .' " ' [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " (*People v. Neal* (2003) 31 Cal.4th 63, 79 [1 Cal.Rptr.3d 650, 72 P.3d 280].) "Coercive police activity is a necessary predicate but does not itself compel a finding that a resulting confession is involuntary. [Citation.] While the fact that a statement was obtained despite the defendant's invocation of the right to counsel is one of the circumstances we consider, it also is not dispositive." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Additionally, "such activity must be, as it were, the 'proximate cause' of the statement in question, and not merely a cause in fact." (*People v. Mickey* (1991) 54 Cal.3d 612, 647 [286 Cal.Rptr. 801, 818 P.2d 84]; see *People v. Benson* (1990) 52 Cal.3d 754, 778–779 [276 Cal.Rptr. 827, 802 P.2d 330].)

"In reviewing the trial court's determinations of voluntariness, we apply an independent standard of review, doing so 'in light of the record in its entirety, including "all the surrounding circumstances—both the characteristics of the accused and the details of the [encounter]." ' " (*People v. Neal, supra*, 31 Cal.4th at p. 80.) But " 'we accept the trial court's factual findings, based on its resolution of factual disputes, its choices among conflicting inferences, and its evaluations of witness credibility, provided that these findings are supported by substantial evidence.' (*People v. Mayfield* (1997) 14 Cal.4th 668, 733 [60 Cal.Rptr.2d 1, 928 P.2d 485].)" (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 56.)

Defendant contends that his police interrogators, Barfknecht and Haseleu "made affirmative statements and engaged in affirmative conduct that created a misrepresentation as to the nature and scope of [defendant's] Fifth Amendment privilege" and "created the impression that the *Miranda* warnings were at least not literally what they appeared to be and that they allowed the police to continue in an attempt to persuade the suspect to waive his Fifth Amendment privilege." At bottom, however, defendant's argument is that *Miranda* violations themselves, if repeated and persistent, are sufficient to establish involuntariness. "However, just as a failure to give *Miranda* warnings does not in and of itself constitute coercion [citation], neither does continued interrogation after a defendant has invoked his right to counsel . . . inherently constitute coercion. [Citation.]" (*People v. Bradford, supra*, 14 Cal.4th at p. 1039; see *Oregon v. Elstad* (1985) 470 U.S. 298, 307 [84 L.Ed.2d 222, 105 S.Ct. 1285] ["Despite the fact that patently *voluntary* statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination"].) Rather, we consider all the relevant circumstances, even in a case where, as here, the police interrogators repeatedly ignored defendant's invocation of his right to counsel.

Our decision in *People v. Coffman and Marlow, supra,* 34 Cal.4th 1 (*Coffman*), is particularly instructive on this issue. In *Coffman,* defendant Marlow argued, as does defendant here, that his statement to police, which was used to impeach him at trial, was involuntary because, inter alia, his interrogator ignored his nine requests to speak with an attorney and "repeatedly assured Marlow that nothing he said could be used in court . . . ." (*Coffman, supra,* 34 Cal.4th at p. 58.) In rejecting his claim, we observed that his interrogation, "while prolonged, was not accompanied by a denial of all creature comforts or accomplished by means of physical or psychological mistreatment, threats of harsh consequences or official inducement amounting to coercion . . . ." (*Ibid.*) While the fact that Marlow's interrogator repeatedly ignored his requests for an attorney gave us cause for concern, "given Marlow's maturity and criminal experience (he was over 30 years old and a convicted felon at the time of the interrogation)—it was unlikely Marlow's will was thereby overborne." (*Id.* at p. 58.) Furthermore, while we acknowledged that statements by Marlow's police interrogator that anything Marlow said could not be used in court "raise the specter of coercion," nonetheless, we concluded that his statements were voluntary. We noted: "Significantly, for a considerable period after [the police officer] began to assure Marlow his statements would not be used, Marlow continued to resist disclosing [the victim's] whereabouts or admitting he committed the offenses. His resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information." (*Id.* at p. 59.)

█ The factors that supported a finding of voluntariness in *Coffman* are even stronger here. Neither the length nor physical circumstances of defendant's interrogation appear to have been coercive; the interrogation was spread over a four-hour period from midmorning to midafternoon with a refreshment break and a lunch break. Nor was the tone of the questioning as evidenced in the transcript particularly harsh or accusatory—indeed, defendant argues that the "excessive" friendliness of the interrogators should be deemed a factor in favor of finding involuntariness. While, as in *Coffman,* the police at one point falsely represented to defendant that his statement could not be used against him in court, defendant's response was to again request a lawyer. Thus, he made no incriminating statement that can be attributed to the false representation. (*People v. Benson, supra,* 52 Cal.3d at p. 778 ["A confession is 'obtained' by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by 'proximate' causation"].) Indeed, contrary to his assertion on appeal that his will was overborne by the officers' repeated ignoring of his request for counsel, here, as was true in *Coffman,* the transcript shows that defendant, a man of mature years with an extensive criminal history, was throughout the interrogation perfectly capable of "calculat[ing] his self-interest in choosing whether to disclose or withhold information." (*Coffman, supra,* 34

Cal.4th at p. 58.) In fact, our review of the transcript reveals that defendant supplied very little information to his interrogators that could have been used for impeachment. We conclude, then, that defendant's statement was voluntary and, assuming his constitutional claims were preserved, we reject them.

Our conclusion that the officers' repeated refusal to honor defendant's invocation of his *Miranda* rights did not induce an involuntary statement should not be construed as condoning the officers' tactics. The Supreme Court has made clear that *"Miranda* is a constitutional decision" (*Dickerson v. United States* (2000) 530 U.S. 428, 438 [147 L.Ed.2d 405, 120 S.Ct. 2326]) and articulates "a constitutional rule" (*id.* at p. 444), notwithstanding exceptions to the rule like the one at issue here. (*Ibid.*) (See *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1122 [23 Cal.Rptr.3d 295, 104 P.3d 98] [*"Miranda* is a rule of constitutional magnitude"].) Thus, the deliberate, intentional and repeated violation of that rule may violate a defendant's constitutional rights. At minimum, "[a]s we have emphasized on more than one occasion, [such] misconduct . . . is 'unethical' and must be 'strongly disapproved.' [Citations.]" (*People v. Neal, supra,* 31 Cal.4th at p. 81.) This type of police misconduct is not only nonproductive, as this case demonstrates, but can be counterproductive because in the appropriate case it would compel us to reverse a conviction. (*Id.* at p. 87.) Surely, the possibility of reversal must outweigh whatever advantage police interrogators hope to gain by systematically ignoring a defendant's invocation of his or her *Miranda* rights. Moreover, respect for the rule of law is not advanced when the guardians of the law elect to deliberately violate it.

In any event, even if the trial court had erred in this case by failing to find defendant's statement wholly involuntary, we would find such error harmless beyond a reasonable doubt. (*People v. Neal, supra,* 31 Cal.4th at p. 86 ["the erroneous denial of defendant's motion to suppress his two confessions is subject to harmless error analysis under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]"].)[5] Defendant argues that, had he taken the stand, he could have

---

[5] Defendant argues that because the trial court's failure to find his statement was involuntary prevented him from testifying, the error is reversible per se. We reject this conclusion. Neither of the United States Supreme Court cases he cites in support of this claim is apposite. In *New Jersey v. Portash* (1979) 440 U.S. 450 [59 L.Ed.2d 501, 99 S.Ct. 1292], a New Jersey appellate court reversed a defendant's conviction because the prosecution planned to use his immunized grand jury testimony from another case at his trial, even though the defendant did not testify at his trial and did not show prejudice. (*Id.* at pp. 454–455, 459–460.) In affirming the New Jersey court, the high court stated simply that "federal law does not insist that New Jersey was wrong in not requiring Portash to take the witness stand in order to raise his constitutional claim." (*Id.* at p. 456.) The court did not set forth a general rule prohibiting harmless error analysis where a defendant asserts that impairment of his Fifth Amendment right prevented him from

offered testimony that he did not plan the murders in advance but was responding to the "pressures" he referred to in his statement that were similar to the pressures he experienced before he murdered Linda Kimball and tried to drown Alice McGowan. He maintains this testimony would have been relevant at the guilt phase to the issue of premeditation and deliberation and whether he actually committed the sexual crimes against Eva Petersen that were the basis of the rape- and sodomy-murder special circumstances as to Eva Petersen. He also argues his testimony would have been relevant at the sanity phase on the question of whether he could distinguish right from wrong at the time he committed the murders.

We conclude that defendant was not prejudiced, because his putative testimony would not have affected the result at either the guilt or sanity phase of his trial. As to premeditation and deliberation, the evidence showed that defendant armed himself with a gun, drove from Indio to Burlingame, surreptitiously entered the victims' residence and shot them both at close range. His motive for the murders was to avenge himself for Spadoni's rejection of him, a rejection that he believed Petersen had encouraged. Thus, there was overwhelming evidence of the three factors—planning, motive, and manner of killing—that may establish premeditation and deliberation. (*People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]; *People v. Stitely* (2005) 35 Cal.4th 514, 543 [26 Cal.Rptr.3d 1, 108 P.3d 182].) Moreover, much of this evidence was produced by defendant himself, in his own words, on the tape recording he prepared for himself in which he narrated his crimes.

With respect to the felony-murder special circumstances of rape and sodomy as to Eva Petersen, defendant claims that the disparity between his description of his sexual attack on Petersen in the tape recording and the physical evidence could have led the jury to conclude that these crimes did not occur, but were the product of defendant's unbalanced mind, a point he would presumably have made had he testified. The physical evidence did not

testifying. In *Brooks v. Tennessee* (1972) 406 U.S. 605 [32 L.Ed.2d 358, 92 S.Ct. 1891], the court invalidated a state procedural rule that required a defendant to testify before any other defense witness or lose his right to testify. With respect to prejudice, the court merely observed: "The State makes no claim that this was harmless error, *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (1967), and petitioner is entitled to a new trial." (*Id.* at p. 613.) Moreover, the predicate of defendant's reversal per se claim—that it was only the trial court's failure to exclude his statement that kept him off the stand—is dubious in the circumstances of this case. As the Supreme Court observed in *Luce v. United States, supra,* 469 U.S. at page 42, "an accused's decision whether to testify 'seldom turns on the resolution of one factor.'" In this case, defendant would have been subject to extensive impeachment with his tape-recorded narration of his crimes and extensive history of violent crimes against women with whom he was in relationships, quite apart from whatever minimal impeachment material could have been gleaned from his statement to police. We think it highly unlikely that admission of his statement would have been the only or, indeed, a significant factor in his decision whether to testify.

show, however, that Petersen had not been raped and sodomized, but only that, because decomposition had begun to set in, the pathologist could not determine whether a sexual assault had occurred on either victim. Thus, the physical evidence was not inconsistent with defendant's description on the tape recording of rape and sodomy. Moreover, evidence that Petersen's body was nude from the waist down and that saliva consistent with defendant's was found on her nipple corroborated his account. On this record, we cannot conclude that defendant's putative testimony that he did not plan the killings or committed them in a "frenzy" or a "trance-like" state would have made any difference to the jury's verdict at either the guilt or sanity phase. We conclude, therefore, that any error in not excluding defendant's statement, if there was error, was harmless beyond a reasonable doubt.

### 2. Evidentiary Issues

#### a. Victims' Expressions of Fear of Defendant

Richard Muniz, defendant's prison friend, testified that seven months before the murders, Eva Petersen called him and asked him to pick up some of defendant's belongings. The defense objected on hearsay and relevance grounds to proposed testimony by Muniz that the reason Petersen wanted him to remove defendant's belongings was because she was afraid of defendant and did not want him anywhere near her house. The prosecutor argued that the evidence was admissible under Evidence Code section 1250 to prove Petersen's state of mind. The prosecutor explained: "I think that's relevant, to show the premeditation involved in this murder, in that . . . this was communicated to [defendant], first of all, by Mr. Muniz at some point; second, that she would not have let him into the house, that he would have had to have broken into the house, which I think shows some degree of premeditation and deliberation in the commission of the crime."

The defense argued that the state of mind exception did not apply because the defense was not claiming that Petersen voluntarily admitted defendant into the residence. Furthermore, the defense argued that because the statement was made seven months before the murder, its relevance, if any, was speculative and the statement should be excluded under Evidence Code section 352. The trial court disagreed and overruled all objections to the evidence. The court said, "As I understand it, the theory is that [Petersen] would not have voluntarily let him in; therefore, bearing upon the question of premeditation . . . ."

Sometime later in the trial, the trial court also admitted testimony from Robert Paredes that Carol Spadoni told him she did not want defendant living with her because she was afraid of him. The defense again objected on

hearsay grounds and the prosecution again successfully argued that the evidence was relevant to her "state of mind and why he wasn't allowed in Burlingame . . . . Again, I think that goes to premeditation for the murder, he knew he wasn't supposed to be in the area."

Defendant argues that the trial court erroneously admitted the evidence of the victims' fear of defendant under the state-of-mind exception because their states of mind were not at issue. The Attorney General argues that the evidence was relevant to defendant's state of mind because it tended to show he was aware that the victims did not want him at their residence and that he would have to gain entrance surreptitiously. The Attorney General also adopts the prosecutor's argument that the evidence showed the victims' state of mind.

In pertinent part, Evidence Code section 1250 creates an exception to the hearsay rule that permits admission of "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) . . . when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).)

"As our cases have made clear, 'a victim's out-of-court statements of fear of an accused are admissible under section 1250 only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant. [Citations.]' " (*People v. Ruiz* (1988) 44 Cal.3d 589, 608 [244 Cal.Rptr. 200, 749 P.2d 854].) In *People v. Armendariz* (1984) 37 Cal.3d 573 [209 Cal.Rptr. 664, 693 P.2d 243], we concluded that the victim's statement to his son that he was afraid because the defendant had demanded money and threatened to assault him if he did not comply, which was made 17 months before the defendant killed the victim, was inadmissible under Evidence Code section 1250 because the victim's state of mind was not at issue. (*People v. Armendariz, supra,* 37 Cal.3d at pp. 585–586.) "[I]n this case there was no issue of fact as to [the victim's] conduct on the night of his death. Appellant did not claim that [the victim] admitted him into the house or otherwise behaved in a friendly manner toward him on the night of the killing. Nor did the evidence raise any question as to whether the killing had been accidental or justifiable. . . . Thus, [the victim's] state of mind was irrelevant and could not be used to justify admission of the disputed statement." (*Id.* at p. 587.)

We reaffirmed this principle in *People v. Hernandez* (2003) 30 Cal.4th 835 [134 Cal.Rptr.2d 602, 69 P.3d 446] where we observed that "[a] prerequisite to

this exception to the hearsay rule is that the declarant's mental state or conduct be factually relevant. [Citations.] A murder victim's fear of the alleged killer may be in issue when the victim's state of mind is directly relevant to an element of an offense. [Citation.] That fear may also be in issue when, according to the defendant, the victim has behaved in a manner inconsistent with that fear [citation]." (*Id.* at p. 872.) An instance of the former is where the victim's statement that she feared the defendant was relevant to whether the victim would have consented to the defendant's entry into her residence where burglary and robbery special circumstances were alleged. "Lack of consent was material to burglary because it was material to the element of entry [citation], and was also material to robbery because it was material to the element of taking by means of force or fear [citation]." (*People v. Waidla, supra,* 22 Cal.4th at p. 723.) An instance of the latter is where the decedent's fear was relevant to disprove the defendant's claim that the victim was sitting on his lap and examining his gun when it accidentally discharged. (*People v. Lew* (1968) 68 Cal.2d 774, 778–780 [69 Cal.Rptr. 102, 441 P.2d 942].)

We agree with defendant that the victims' statements were inadmissible under Evidence Code section 1250 because the state of mind of the victims was not relevant to any disputed issue. Thus, to the extent the trial court admitted the statements under this theory, the trial court erred. However, threaded through the discussion of the admissibility of Petersen's statement was the prosecution's contention that, because the statement had been communicated to defendant by Muniz, it was generally admissible on the issue of premeditation. The trial court agreed that Petersen's statement had some "bearing upon the question of premeditation. . . ."

To the extent that Petersen's statement was admitted to show its effect on defendant, the statement was not hearsay because it was not admitted for the truth—that is, that Petersen *was* afraid of defendant. (See *People v. Boyette* (2002) 29 Cal.4th 381, 428–429 [127 Cal.Rptr.2d 544, 58 P.3d 391] [trial court erroneously excluded as hearsay testimony by defendant's mother of threats against her where defendant testified that such threats had led him to accept blame for shooting to protect his family; "evidence of threats would not have been barred by the hearsay rule, for such evidence would not have been offered for its truth (i.e., that Thomas or Johnson actually intended to retaliate against defendant or his family), but for a different purpose: to show the effect of the statements on defendant"]; *People v. Jackson* (1991) 235 Cal.App.3d 1670, 1680–1681 [1 Cal.Rptr.2d 778] [evidence of threat admitted for nonhearsay purpose of showing consciousness of guilt].)

██ However, "[a] hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is

relevant to an issue in dispute." (*People v. Armendariz, supra*, 37 Cal.3d 573, 585.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) We review a trial court's relevance determination under the deferential abuse of discretion standard. (*People v. Heard* (2003) 31 Cal.4th 946, 973 [4 Cal.Rptr.3d 131, 75 P.3d 53].) Evidence that defendant believed Petersen was afraid of him had some bearing on his mental state in going to visit the women—as the trial court expressed it, "he was not going for a friendly visit"—and how he planned to approach the victims (by stealth as opposed to open confrontation) both of which, in turn, were relevant to premeditation. Accordingly, we conclude that the trial court did not abuse its discretion to the extent it admitted evidence of Petersen's statement for its effect on defendant and notwithstanding that the statement was communicated to him seven months before the murders. To the extent the victims' statements were erroneously admitted under Evidence Code section 1250, in light of the overwhelming evidence of defendant's guilt, the error was harmless under either the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) for assessing the prejudicial effect of state error or the *Chapman* standard (*Chapman v. California, supra*, 386 U.S. at p. 24) for evaluating the prejudicial effect of federal constitutional error.

### b. *Homemade Handcuffs and Stun Gun*

The officer who conducted the search of defendant's vehicle after his arrest in Kansas testified that among the items he recovered from the vehicle was a roll of duct tape, homemade wire handcuffs, and a stun gun. Defense counsel objected to admission of the handcuffs and the stun gun on grounds of relevance. The prosecutor's offer of proof as to both items was that they showed that defendant was prepared to restrain or immobilize the victims before he arrived in Burlingame and they were therefore relevant to premeditation. With respect to the stun gun, defense counsel also objected pursuant to Evidence Code section 1101, subdivision (a) because it "just tends to show a character." Defendant contends the trial court abused its discretion by admitting the items.

As noted, relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) In reviewing a trial court's relevance ruling we apply the abuse of discretion standard. (*People v. Panah* (2005) 35 Cal.4th 395, 474 [25 Cal.Rptr.3d 672, 107 P.3d 790].) Here, premeditation was a disputed fact and evidence that defendant carried devices to the crime scene that could have been used to restrain or immobilize the victims was relevant to premeditation. (*People v. Anderson, supra*, 70 Cal.2d at pp. 26–27 [evidence of planning activity is pertinent to the determination of premeditation and

deliberation].) The relevance of these items was enhanced by additional evidence surrounding the commission of the crimes, including defendant's apparently surreptitious entry into the victims' residence and his use of duct tape to gag Carol Spadoni and a towel to gag Eva Petersen. It reasonably can be inferred from this evidence that defendant planned to take the victims by surprise and also planned to restrain or immobilize them to prevent them from resisting or seeking help.

Defendant cites a series of Court of Appeal cases for the proposition that "[e]vidence of possession of a weapon not used in the crime charged against defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of no relevant consequence to determination of the guilt or innocence of the defendant." (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360 [129 Cal.Rptr. 844], italics omitted.) But each of these decisions is readily distinguishable on its facts because in each case the weapons had no relationship at all to the charged crime and, by extension, were not relevant to any issue in dispute. (See, e.g., *People v. Witt* (1958) 159 Cal.App.2d 492, 497 [324 P.2d 79] [weapons that were not taken in the burglary of which defendant was convicted, but were found in his car, were inadmissible at his trial for burglary]; *People v. Henderson, supra,* 58 Cal.App.3d at p. 360 [second handgun found in defendant's apartment that he did not use in committing assault upon police officers with a firearm was irrelevant for any purpose]; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392 [99 Cal.Rptr.2d 230] [knives found in defendant's backyard almost two years after the murder with which he was charged, that were determined not to have been the murder weapons, were irrelevant to show planning or availability of weapons].) Here, by contrast, the items recovered from defendant's vehicle were relevant to premeditation. (See *People v. Smith* (2003) 30 Cal.4th 581, 613 [134 Cal.Rptr.2d 1, 68 P.3d 302] [trial court did not err in admitting evidence that defendant owned a derringer and ammunition not used in the murder because "[t]his evidence did not merely show that defendant was the sort of person who carries deadly weapons, but it was relevant to his state of mind when he shot [the victim]"].)

 Defense counsel also perfunctorily objected to the admission of the stun gun pursuant to Evidence Code section 1101. That statute prohibits character evidence to prove conduct on a specific occasion but does not prohibit evidence "that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) Here, defendant's possession of the stun gun was not admitted to prove disposition but to prove preparation, which was relevant to establish premeditation. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the items at issue. Even were we to conclude, however,

that admission of those items was erroneous, given the overwhelming evidence of defendant's guilt, we would find any error harmless. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California, supra,* 386 U.S. at p. 24.)

### c. *Exclusion of Impeachment Evidence*

Defendant contends the trial court erroneously excluded evidence that would have impeached testimony by his parole officer, Robert Paredes, that Paredes did not observe any indication of mental disorder in his meetings with defendant. The evidence consisted of a letter written to Paredes by Dr. Sylvia Winters, a psychiatrist at the Loma Linda VA hospital, in which she recommended that defendant sleep alone and not be in areas where there were helicopters flying overhead. These recommendations were related to her tentative diagnosis that defendant suffered from posttraumatic stress disorder. The prosecutor objected that the letter was hearsay. Defense counsel argued the letter was relevant to impeach Paredes's "capacity to perceive" defendant's mental state.

Defendant now argues that Paredes was testifying as an expert witness on mental disorders and, therefore, Dr. Winters's letter was proper impeachment of his opinion that defendant did not suffer from such disorder. (*People v. Montiel* (1993) 5 Cal.4th 877, 924 [21 Cal.Rptr.2d 705, 855 P.2d 1277] ["It is common practice to challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have overlooked or ignored"].) This argument was not presented to the trial court as a basis to permit impeachment of Paredes with the letter and, therefore, the claim is forfeited. (*People v. Fauber* (1992) 2 Cal.4th 792, 831 [9 Cal.Rptr.2d 24, 831 P.2d 249].) But even if the claim has not been forfeited, it is without merit. Notwithstanding Paredes's testimony that he had taken classes in abnormal psychology, the prosecutor did not attempt to qualify him as an expert on that subject, nor did the court designate him as such. It is the trial court that makes this determination (see, e.g., *People v. James* (1989) 208 Cal.App.3d 1155, 1164 [256 Cal.Rptr. 661]), and defendant cites no relevant authority for his assertion that a witness becomes a de facto expert simply because his or her personal observations may be partially informed by some professional training. Here, Paredes's testimony about defendant's mental condition was based on his asking defendant questions about his mental functioning and his observations of defendant's behavior, not on any professional expertise. Thus, Paredes did not testify as an expert and Dr. Winters's letter was properly excluded.

As an addendum to his argument, defendant makes the same claim with respect to the trial court's exclusion, on grounds it was hearsay, of a

Department of Corrections report received by Paredes that contained a statement by a Dr. Solon that defendant's psychosis could set in at any time. We reject his claim for the reasons set forth above.

### d. *Admission of Defendant's Letter to Eva Petersen*

Defendant contends that the trial court abused its discretion under Evidence Code section 352 when it admitted a letter from defendant to Eva Petersen in 1982, while defendant was in prison, in the course of which he wrote: "But, of course, I'll try to get hold of your big breasts under your nightie. I would love to feel them and suck their nipples until they get big and round and hard. I would never go down below your waist, but I am going to make them free game, O.K.?" The prosecution argued the letter was evidence of defendant's sexual intent toward Petersen as to whom rape and sodomy special circumstances were alleged. Defense counsel argued the probative value was weak in comparison to the prejudicial nature of the letter.[6] The trial court overruled the defense objection. The court observed that it expected the defense to argue that, notwithstanding defendant's tape-recorded account of his sexual assault on Eva Petersen, there was "no sexual intent or actual sexual contact. I think the probative value of this particular note is extremely high, and that the probative value is not outweighed by the probability that the admission of the note will create a substantial danger of undue prejudice." The trial court acknowledged that the fact the letter was written nine years before the murders would ordinarily be an important factor in weighing its probative value against its potential prejudicial impact but agreed with the prosecutor that "this is the first opportunity the defendant would have had to carry out those desires because of his imprisonment."

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations]. Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla, supra,* 22 Cal.4th at p. 724.) Here, defendant's expression of a prurient sexual interest in his mother-in-law was relevant to issues in dispute at his trial, namely, the truth of the sodomy and rape special circumstances. The time lag between when the letter was written and when the offenses occurred was substantial, but the trial court factored this into its analysis and concluded, not unreasonably, that defendant would have been unable to act on his desires any sooner than he did because he was in prison. And, although distasteful, the letter was not so repellant as to have engendered against defendant the

---

[6] Trial counsel also perfunctorily objected on relevance grounds and under Evidence Code section 1101 but neither argument is renewed on appeal.

particular type of prejudice with which Evidence Code section 352 is concerned. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125 [12 Cal.Rptr.3d 592, 88 P.3d 498] [" 'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant' "].) We conclude, therefore, that the trial court did not abuse its discretion in admitting the letter.

### 3. Cumulative Prejudice

Defendant contends that the cumulative prejudice from the preceding claims of guilt phase error requires reversal. However, " '[d]efendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.' " (*People v. Panah, supra*, 35 Cal.4th at pp. 479–480.)

### 4. Section 190.41

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. [Citations.] Though mandated by no statute, and never deemed a constitutional guaranty, the rule requiring some independent proof of the corpus delicti has roots in the common law." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 [119 Cal.Rptr.2d 903, 46 P.3d 372].)

In *People v. Mattson* (1984) 37 Cal.3d 85, 94 [207 Cal.Rptr. 278, 688 P.2d 887], we concluded that "the corpus delicti of felony-based special circumstances must be established independently of an accused's extrajudicial statements." *Mattson* was abrogated in 1990 by passage of Proposition 115, which added section 190.41 to the Penal Code. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1263, fn. 1 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Section 190.41 states in relevant part: "[T]he corpus delicti of a felony-based special circumstance enumerated in paragraph (17) of subdivision (a) of Section 190.2 need not be proved independently of a defendant's extrajudicial statement." In *People v. Ray* (1996) 13 Cal.4th 313 [52 Cal.Rptr.2d 296, 914 P.2d 846], we noted that this section "applies to crimes committed after it became effective on June 6, 1990." (*Id.* at p. 341, fn. 13.)

Defendant's offenses were committed in April 1991 and, therefore, section 190.41 applied. Nonetheless, defense counsel objected to an instruction based on that section that informed the jury, "the existence of a special circumstance

may be established by a confession or an admission." As relevant here, defense counsel argued that section 190.41 violated the Eighth Amendment's requirement of a meaningful narrowing of the class of murders as to which the death penalty may be imposed. (*Furman v. Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 92 S.Ct. 2726] (conc. opn. of White, J.); *Godfrey v. Georgia* (1980) 446 U.S. 420, 427–428 [64 L.Ed.2d 398, 100 S.Ct. 1759]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1023 [254 Cal.Rptr. 586, 766 P.2d 1].) Additionally, defense counsel argued that the statute violated the requirement of heightened reliability in capital cases. Defendant renews both claims on appeal.

■ At the outset, we presume that the abolition of the corpus delicti rule with respect to special circumstances via section 190.41 was a constitutionally valid exercise of the initiative process. (*People v. Davenport* (1985) 41 Cal.3d 247, 263 [221 Cal.Rptr. 794, 710 P.2d 861] ["The presumption that the legislating body intended to enact a valid stature applies to measures enacted by initiative as well as those enacted by the Legislature"]; *Mills v. Superior Court* (1986) 42 Cal.3d 951, 957 [232 Cal.Rptr. 141, 728 P.2d 211] ["[I]t is our duty to uphold a statute unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity"].)

■ Bearing these principles in mind, we examine defendant's Eighth Amendment arguments. As defendant acknowledges, in California's death penalty scheme, the Eighth Amendment's narrowing function "is performed by the requirement that a capital jury sustain at least one statutorily enumerated special circumstance." (*People v. Boyette, supra,* 29 Cal.4th at p. 439.) Here, the jury found true four special circumstances, including the rape and sodomy special circumstances, and the prior-murder and multiple-murder special circumstances. Thus, in this case, the narrowing requirement was fulfilled by the jury's findings. Defendant, however, suggests that the Eighth Amendment also prescribes a particular manner in which the special circumstances must be proved as part of the narrowing functioning, but he cites no authority for this proposition. In this connection, we consider his related claim that the Eighth Amendment's requirement of heightened reliability in capital cases mandates application of the corpus delicti rule to felony-based special circumstances. The requirement that the special circumstances be based on reliable evidence does not, however, include a further requirement that they be proved in compliance with any particular rule of evidence. Rules of evidence are subject to change and, as a general matter, the ordinary application of such rules in a capital case does not raise constitutional concerns. (*People v. Boyette, supra,* 29 Cal.4th at pp. 427–428.)

■ As we have already observed, the corpus delicti rule is neither a rule of constitutional magnitude nor statutorily mandated. It is a common law rule

of evidence the purpose of which is to "ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*People v. Alvarez, supra,* 27 Cal.4th at p. 1169.) Moreover, "[t]he amount of independent proof of a crime required for this purpose is quite small; we have described this quantum of evidence as 'slight' [citation] or 'minimal' [citation]. The People need make only a prima facie showing ' "permitting the reasonable inference that a crime was committed." ' [Citation.] The inference need not be 'the only, or even the most compelling, one . . . [but need only be] a *reasonable* one . . . .' [(*People v.*] *Jennings* [(1991) 53 Cal.3d 334, 367 [279 Cal.Rptr. 780, 807 P.2d 1009]].)" (*People v. Jones* (1998) 17 Cal.4th 279, 301 [70 Cal.Rptr.2d 793, 949 P.2d 890].)

In *People v. Weaver, supra,* 26 Cal.4th 876, the defendant argued that the corpus delicti rule precluded the prosecution from using his uncorroborated admissions that he raped the victim to establish first degree murder on a felony-murder theory. Like defendant here, the defendant based his argument on the Eighth Amendment's heightened reliability requirement. We rejected his claim: "The motivating idea of the corpus delicti rule—to protect an accused from his or her own fabricated statements—has little application in this situation, where the corpus delicti of murder is established by ample evidence of a homicide committed by a criminal agency. . . . Application of the corpus delicti rule to the charge that he committed murder also protects [the defendant]. He finally is protected by his ability, should he so desire, to attempt to exclude his statements by proving they were the product of his mental impairment or of police misconduct." (*Id.* at p. 930.) In a capital case, then, because the corpus delicti rule still applies to the underlying homicide there is no danger that a defendant will be convicted of that homicide on his untested words alone. Moreover, a defendant can attempt to exclude his statements on the grounds that they are the result of police coercion or mental impairment. These safeguards protect a defendant against the very dangers that the corpus delicti rule came into existence to address, that is, the conviction of a defendant of a crime that did not occur but which the defendant admitted to either as a result of official coercion or mental impairment. (See *People v. Jones, supra,* 17 Cal.4th at p. 320 (conc. opn. of Mosk, J.).) Thus, the fact that the corpus delicti rule does not apply to determine the degree of murder in a capital case did not violate the Eighth Amendment. (*People v. Weaver, supra,* 26 Cal.4th at pp. 929–931.)

Although *Weaver* addressed the corpus delicti rule in the context of felony murder and not felony-based special circumstances, our observations in *Weaver* are also relevant to this case. There was ample evidence, apart from defendant's admissions, that he murdered Eva Petersen. Had defendant's admissions regarding his sexual assault on Petersen been the result of police misconduct, he could have challenged them on that ground. He did not, of course, because these statements were not extracted from him by police, but

were addressed to himself. Defendant was also free to present evidence that the admissions were confabulated and the product of mental delusion. Moreover, while the jury was instructed that the existence of the special circumstances "may" be established by a confession or admission, it was not instructed that it was restricted to such evidence. The jury was free, therefore, to assess whether independent evidence supported the sodomy and rape special circumstances. In this case, there was independent evidence consistent with the special circumstance allegations. Petersen's body was found naked from the waist down, with her sweat shirt and bra pushed over her breasts, and saliva consistent with defendant's was found on her nipple. Additionally, defendant had written Petersen a letter expressing his prurient sexual interest in her. Finally, the pathologist who examined her body did not rule out sexual assault but testified only that, because of the decomposition of the victims' bodies, she could not determine whether a sexual assault had occurred.

If the corpus delicti rule still applied to felony-based special circumstances, this evidence would have been more than sufficient to establish the corpus delicti. As it stands, this evidence, coupled with defendant's admissions, is sufficient to allay any doubt about the reliability of the special circumstance findings for Eighth Amendment purposes.[7]

### C. *Sanity Phase Issues*

#### 1. *"Serial Killer" Testimony*

Defendant contends that the trial court erred when it denied his motion for a mistrial based on testimony by Dr. Wilkinson, the court-appointed psychiatrist, that defendant was a serial killer. He alternatively argues that the trial court erred in overruling his Evidence Code section 352 objection to the testimony. As he did in the trial court, defendant contends that "serial killer" is not a known classification of mental disease or disorder but a popular culture term that had a tendency to inflame the jury's prejudices and passions against him.

Denial of a motion for a mistrial is reviewed for abuse of discretion, and the motion should be granted only when " ' " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Ayala* (2000) 24 Cal.4th 243, 284 [99 Cal.Rptr.2d 532, 6 P.3d 193].) The trial court's rulings

---

[7] Defendant asserts, without elaboration, a Sixth Amendment right that the issue of corpus delicti corroboration must be submitted to the jury, citing *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]. He fails to explain the basis of his Sixth Amendment claim. To the extent it appears to be based on his Eighth Amendment claim—that the felony-based special circumstance allegations must be proved through application of the corpus delicti rule—our analysis applies with equal force to the Sixth Amendment claim.

under Evidence Code section 352 are, of course, also reviewed for abuse of discretion. (*People v. Waidla, supra*, 22 Cal.4th at p. 724.)

The issue at the sanity phase was whether defendant was "incapable of knowing or understanding the nature and quality of his . . . act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).) As we have elsewhere observed, in assisting the jury to make this determination, "[n]o precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1154 [265 Cal.Rptr. 111, 783 P.2d 698] [defense expert testimony that defendant displayed no signs of sexual deviance or abnormality admissible to prove lack of disposition to commit lewd and lascivious acts upon a child]; *People v. Carpenter* (1997) 15 Cal.4th 312, 406 [63 Cal.Rptr.2d 1, 935 P.2d 708] [" 'Psychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness' "].) Thus, the trial court must be given wide berth in its assessment of the probative value of expert testimony on the issue of defendant's sanity.

In this case, the prosecutor elicited testimony from Dr. Wilkinson as to whether defendant was a serial killer to explain that certain bizarre aspects of defendant's behavior were not necessarily indicative of insanity. Dr. Wilkinson testified that a serial killer is someone for whom killing "releases, frequently, internal tensions. They'll feel a terrible turmoil, and by doing the murder, they get not only a thrill, but some internal calming." Thus, he explained, the tape recording defendant made memorializing his crimes and the notation he made on his belt with the names and dates of the murders of Carol Spadoni and Eva Petersen fit the pattern of serial killers who collect "mementos" that "help [them] relive the experience and retouch some of the gratification that they gained by doing the acts." When asked whether this behavior was indicative of insanity, Wilkinson replied: "Insanity has a legal definition that must be met in order to apply that label. It doesn't matter how sick someone is, they have to meet the legal criteria. [¶] So, you know, it may or may not be an indication of insanity."

Wilkinson also testified that other aspects of defendant's conduct, like the "ritualistic" way in which the murders were committed, indications that he wanted to exercise control over his victims, and his interest in police procedure were also consistent with patterns of serial killers. In his subsequent testimony outside the presence of the jury on the prosecution's offer of proof, Wilkinson testified that in arriving at these opinions regarding the behavior of serial killers, he had consulted psychiatric literature, including

articles in the Bulletin of the American Academy of Psychiatry and the Law and the Journal of the American Psychiatric Association.

In seeking a mistrial, the defense argued that "serial killer" was a "media term," not a classification of mental disease, and "whether or not [defendant] was a serial killer has nothing to do with sanity." The defense argued that the characterization of defendant as a serial killer might lead the jury to link him with other notorious serial killers like the Zodiac killer or John Wayne Gacy and was highly prejudicial to his right to an individualized determination of his sanity. The prosecutor responded: "I think it is important for the jury to understand that there have been studies done of serial murderers, that this is a common thing that they do and not necessarily indicative of insanity but of a need for power and control." The trial court denied the motion for mistrial and the defense's alternative claim that the evidence was more prejudicial than probative.

We find no abuse of discretion. Defendant cites no authority for the proposition that the only expert evidence admissible on the issue of a defendant's sanity must be confined to classifications of mental disease or disorder found in the Diagnostic and Statistical Manual of Mental Disorders. As Dr. Wilkinson testified, the phenomenon of serial murderers has been the subject of professional interest in the psychiatric community, and his testimony regarding the behavior of serial murderers and its relation to defendant's conduct as it bore on the question of his sanity was undoubtedly relevant to that issue. Nor do we find that either his testimony or the characterization of defendant as a serial killer was more prejudicial than probative. In relation to the testimony the jury heard regarding the shocking circumstances of defendant's crimes, Dr. Wilkinson's testimony was relatively innocuous.[8] Finally, we reject as a mischaracterization of Dr. Wilkinson's testimony defendant's assertion that it implied that all serial killers are legally sane.

### 2. CALJIC No. 4.00

CALJIC No. 4.00, the standard instruction on the insanity defense, which was given in this case, states: "A person is legally insane when by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from

---

[8] Defendant seems to suggest at certain points in his argument that the evidence was also inadmissible because he did not fit the pattern of a serial killer. This was not the basis of any objection below, and is thus forfeited. Defendant also asserts that admission of the evidence violated his federal constitutional rights under the Fourteenth and Eighth Amendments—claims that were not made at trial and, in any event, as we have rejected their predicate, are without merit.

wrong at the time of the commission of the crime." Defendant contends the instruction misstates the M'Naghten test for legal insanity, from which it is derived, because it fails to inform the jury that a defendant's incapacity to distinguish right from wrong at the commission of the crime must be in relation to that act, and not a general inability to do so. (See *People v. Kelly* (1973) 10 Cal.3d 565, 574 [111 Cal.Rptr. 171, 516 P.2d 875] ["Insanity, under the California M'Naughton [*sic*] test, denotes a mental condition which renders a person incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong *in relation to that act*" (italics added)].) According to defendant, the instruction is flawed because "the true question is not the general incapacity, whether temporally limited or not, but the specific incapacity to distinguish right from wrong in relation to the crime." Thus, defendant maintains, he was required to establish that his "incapacity to distinguish right from wrong had to be thoroughgoing, complete, and absolute in order to establish legal insanity for the charged crime."

As defendant acknowledges, in *People v. Kelly* (1992) 1 Cal.4th 495, 535 [3 Cal.Rptr.2d 677, 822 P.2d 385], we concluded that this instruction, which essentially tracks the language of section 25, subdivision (b), "correctly and adequately explain[s] the applicable law to the jury." He argues, however, that his specific objection to the instruction was neither made nor considered in *Kelly*.

In assessing a claim of instructional error, "we must view a challenged portion 'in the context of the instructions as a whole and the trial record' to determine ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*People v. Reliford* (2003) 29 Cal.4th 1007, 1013 [130 Cal.Rptr.2d 254, 62 P.3d 601], quoting *Estelle v. McGuire, supra*, 502 U.S. at p. 72.) Here, immediately before the jury was given CALJIC No. 4.00, it was instructed that "You may consider evidence of [defendant's] mental condition before, during, and after the time of the commission of the crime as tending to show the defendant's mental condition *at the time the crime was committed.*" Immediately following the giving of CALJIC No. 4.00, the jury was additionally instructed: "In determining if the defendant was capable of distinguishing right from wrong, the term 'wrong' refers to both legal wrong and moral wrong. If *during the commission of the crime* the defendant was incapable of understanding that his act was morally wrong or was incapable of understanding that his act was unlawful, then he is not criminally liable." Even

if we assume that defendant's strained reading of CALJIC No. 4.00 is plausible, any ambiguity in that instruction is resolved when it is considered in context of these further instructions because they clearly focus the jury's attention on defendant's capacity to distinguish right from wrong at the time of the commission of the crimes. We therefore reject defendant's claim of instructional error.

### 3. *Effect of Guilt Phase Errors*

Observing that the sanity trial is part of the same proceeding as the guilt phase (*People v. Hernandez* (2000) 22 Cal.4th 512, 522 [93 Cal.Rptr.2d 509, 994 P.2d 354]), defendant contends that the alleged violation of his Fifth and Sixth Amendment rights by the admission of his pretrial statement to police and other evidentiary errors occurring at the guilt phase prejudiced him at the sanity phase. We disagree.

Defendant asserts that had the trial court not erred by admitting his pretrial statement, he could have testified and shed light on his mental state, particularly premeditation and deliberation and other unspecified matters "even more proximately relevant to the question of sanity vel non." We have concluded that the statement was not involuntary and its admission was not error, thus eliminating the predicate of his prejudice claim. We have alternatively concluded that even if admission of the statement was error, the error was harmless beyond a reasonable doubt, specifically on the issues of premeditation and deliberation. We have further concluded, in light of this same evidence of defendant's goal-directed behavior before, during, and after the Spadoni-Petersen murders, his putative testimony that he committed those killings in a frenzy or trance-like state would have made no difference to the jury's verdict at either the guilt or sanity phases. (*Ante*, at pp. 810–818.)

Defendant also contends that the evidentiary errors discussed previously (*ante*, at pp. 818–825) either singularly or cumulatively prejudiced him at the sanity phase and require reversal of the sanity determination. Of the evidentiary claims by defendant, we have concluded that only the admission of the victims' expressions of fear of defendant constituted partial error but that, in light of the overwhelming evidence of his guilt, the error was harmless under either *Watson* or *Chapman*. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California, supra,* 386 U.S. at p. 29.) As for his remaining claims of evidentiary error, we found no error, thus eliminating the predicate for prejudice either as a result of individual error or cumulative error. Alternatively, we found any possible error, whether individual or cumulative, to be harmless under either *Watson* or *Chapman*. For these reasons, we also reject his argument that he suffered any prejudice in the sanity phase arising from these claims of evidentiary error.

### D. Penalty Phase Issues

#### 1. Effect of Sanity and Guilt Phase Errors

Defendant renews two claims of error from the sanity and guilt phases of his trial and argues that, if not prejudicial at those stages of the proceeding, they were prejudicial at the penalty phase. First, he claims that Dr. Wilkinson's "serial killer" testimony improperly prejudiced his case in mitigation. Since we have concluded that the admission of Dr. Wilkinson's testimony was not error, defendant was necessarily not prejudiced. But even had we found that the trial court abused its discretion in admitting the testimony, we would reject defendant's claim that such error undermined the reliability of the death verdict. (*People v. Mickle* (1991) 54 Cal.3d 140, 197 [284 Cal.Rptr. 511, 814 P.2d 290].) Defendant's long history of violence against women in his birth family (his sister and mother), his wives or women with whom he was in a domestic relationship (Alice McGowan, Jane S., Linda Kimball, Carol Spadoni), the mothers of those women (Isobel Pahls, Eva Petersen), acquaintances (Marsha S., Mary M., Fathyma Vann), and total strangers (Eileen Millsap, Margie Rogers) was voluminous, graphic and compelling. In contrast to the evidence in aggravation, the mitigating evidence was weak. We are not persuaded that labeling defendant a "serial killer"—assuming only for argument's sake that this label was in any way inappropriate—unfairly tipped the scale at the penalty phase.

We also reject defendant's second claim that the admission of his pretrial statement to police prejudiced him in the penalty phase because it prevented him from testifying. Defendant asserts he could have testified to his mental state not only during the charged crimes, but also at the time of the other offenses used as evidence in aggravation. Again, since we have concluded the statement was voluntary and its admission was not error, there is no foundation for his claim of prejudice. Alternatively, we again conclude that, even if its admission was error, "in light of the whole record, it is not reasonably possible that the jury would have returned a different penalty verdict but for the assumed error." (*People v. Ervin* (2000) 22 Cal.4th 48, 103 [91 Cal.Rptr.2d 623, 990 P.2d 506].)

#### 2. Evidentiary Error

Defendant contends the trial court erroneously admitted his tape-recorded description of his desire to sexually assault and murder a woman he saw at a rest stop as evidence of defendant's intent during his encounter with Yvette Shelby at another rest stop. Shelby testified that defendant brandished a gun

at her, but then dropped it, allowing her to escape. She informed a police officer, who stopped defendant, but the officer was satisfied with defendant's explanation that he carried the gun for protection and it had fallen out of his car as he was getting out. Defendant's tape recording described another encounter in which he saw a woman and her child and expressed a desire to rape and kill her and her child. Over defendant's Evidence Code section 352 objection, the trial court admitted the evidence pursuant to Evidence Code section 1101, subdivision (b) as probative of his intent when he brandished a gun at Shelby.[9]

On appeal, defendant does not challenge the trial court's conclusion that the evidence was relevant to intent, but claims that the trial court should nonetheless have excluded it under Evidence Code section 352, and that its admission violates not only that statute, but his federal constitutional rights to due process and a reliable death penalty verdict under the Fourteenth and Eighth Amendments. Defendant asserts that the jury was incapable of understanding that the tape recording was admitted only to show intent, and may instead have improperly considered the incident described in the recording as a separate factor in aggravation under section 190.3, factor (b).[10]

■ Here, the jury was given a limiting instruction in which it was told that evidence admitted for a limited purpose could not be considered "for any purpose except the limited purpose for which it was admitted." We presume that the jury understood and followed the instructions. (*People v. Stitely, supra,* 35 Cal.4th at p. 559.)

■ Moreover, defendant's argument flies in the face of the principle that, with respect to uncharged-violent-crime evidence, a trial court has narrower discretion under Evidence Code section 352 to exclude such evidence at the penalty phase. (*People v. Karis* (1988) 46 Cal.3d 612, 641–642, fn. 21 [250 Cal.Rptr. 659, 758 P.2d 1189] [although Evid. Code, § 352 applies at the penalty phase, "the court does not have discretion to prevent introduction at the penalty phase of all evidence of a capital defendant's commission or attempted commission of a prior violent felony"].) In this case, defendant brandished a gun at Yvette Shelby, which on its face

---

[9] Evidence Code section 1101, subdivision (b) provides an exception to the ban of character evidence to prove conduct where such evidence is admitted "when relevant to prove some [other] fact," including intent. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

[10] Section 190.3, factor (b) permits the penalty phase jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use . . . of force or violence or the express or implied threat to use force or violence."

was admissible as evidence of criminal activity that involved "the express or implied threat to use force or violence" under section 190.3, factor (b). But because there was a dispute as to whether it was a deliberate act or an accidental one, the prosecution was entitled to present additional evidence relevant to defendant's intent. While the trial court may have retained some discretion to exclude the intent evidence under section 352, that discretion was narrower, not greater, than at the guilt phase.

Accordingly, we reject his claim that the trial court abused its discretion under Evidence Code section 352 in admitting the evidence and, of necessity, the edifice of constitutional violation he attempts to construct on this claim of error.

### 3. *Prosecutorial Misconduct*

Defendant contends that statements made by the prosecutor during his closing argument constituted prosecutorial misconduct. "When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (*People v. Panah, supra,* 35 Cal.4th at p. 462.) As a prerequisite for advancing a claim of prosecutorial misconduct, the defendant is required to have objected to the alleged misconduct and requested an admonition "unless an objection would have been futile or an admonition ineffective." (*People v. Arias* (1996) 13 Cal.4th 92, 159 [51 Cal.Rptr.2d 770, 913 P.2d 980].) "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*People v. Panah, supra,* at p. 462.) " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.] 'Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 337 [30 Cal.Rptr.3d 513, 114 P.3d 758].)

While reviewing the testimony of defendant's sister, Patsy, that defendant had committed an attempted sexual assault on her when she and defendant were teenagers, the prosecutor acknowledged that Patsy's credibility as a

witness at other points of her testimony was suspect, particularly her memory as a three- or four-year-old that defendant had been sexually molested. He nonetheless argued: "The only things I would say about that are the things that happened when she was a teenager, when she was 14 or 15 years old, those memories may well be much more reliable than memories she thinks she has at the age of three or four. That's all I'm going to say about that. [¶] If—you heard her testify about what he did, *you also have the benefit of knowing how he operates with his other victims,* if you believe all that she told you about what he did to her when he was a teenager, that fact has been proven beyond a reasonable doubt. If you don't, then simply don't consider it."

Defendant did not object to these statements. On appeal, however, citing the italicized statement, he claims that the prosecutor committed misconduct by inviting the jury to use evidence of defendant's other violent crimes as proof of his propensity to have assaulted his sister Patsy. (See Evid. Code, § 1101, subd. (a).)

Preliminarily, by failing to object to the argument and seek a curative admonition, defendant has forfeited the claim. His assertion that an objection and request for admonition would have been futile because the evidence of the prior offenses was "intensely provocative" is not persuasive. It would have been a simple matter, upon proper objection and request, for the trial court to have admonished the jury not to consider the evidence of those other offenses as proof that defendant committed the attempted sexual assault on his sister. In any event, even if we consider the claim on its merits, and assume the italicized statement was improper, this brief statement did not rise to a level of misconduct requiring reversal. (*People v. Brown* (2003) 31 Cal.4th 518, 553–554 [3 Cal.Rptr.3d 145, 73 P.3d 1137] [reviewing court does not lightly infer that the jury drew the most damaging, rather than the least damaging meaning of allegedly improper statement which, in any event, was "brief and fleeting" and nonprejudicial].)

Defendant also claims the prosecutor committed reversible misconduct when he referred briefly to Lorena Bobbitt and the Menendez brothers. The references came in the context of the prosecutor's discussion of a defense in which a defendant seeks to depict himself or herself as a victim and thus to deflect responsibility for his or her conduct. Defense counsel objected to the references to Bobbitt and the Menendez brothers, but his objection was overruled.

" 'In general, prosecutors should refrain from comparing defendants to historic or fictional villains, especially where the comparisons are wholly inappropriate or unlinked to the evidence.' " (*People v. Jones* (1997) 15

Cal.4th 119, 180 [61 Cal.Rptr.2d 386, 931 P.2d 960], quoting *People v. Bloom* (1989) 48 Cal.3d 1194, 1213 [259 Cal.Rptr. 669, 774 P.2d 698].) In this case, the prosecutor did not compare defendant to either Bobbitt or the Menendez brothers, but referred to them to illustrate a larger point about defenses based on shifting moral culpability for crimes away from a defendant. Such references were not, in context, impermissible nor did they constitute misconduct. But even if we found these brief references were misconduct, we do not assume the jury applied those references in an erroneous or improper manner or even that it drew the most damaging meaning from them; reversal is not required. (*People v. Brown, supra,* 31 Cal.4th at p. 553.)

### 4. *Constitutional Challenges to the Death Penalty Statute*

Defendant raises a number of challenges to the death penalty statute (§ 190.2) that we have considered and consistently rejected in previous decisions. He provides no persuasive reasons for us to reexamine these conclusions. We again therefore conclude that: (1) the statute adequately narrows the class of death-eligible offenders (*People v. Stitely, supra,* 35 Cal.4th at p. 573; *People v. Panah, supra,* 35 Cal.4th at p. 499; *People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442]); (2) the statute is not unconstitutional because it does not require that the jury find death is an appropriate penalty beyond a reasonable doubt (*People v. Stitely, supra,* 35 Cal.4th at p. 573; *People v. Diaz* (1992) 3 Cal.4th 495, 569 [11 Cal.Rptr.2d 353, 834 P.2d 1171]); (3) the statute is not unconstitutional because it does not require unanimity as to aggravating factors (*People v. Sapp* (2003) 31 Cal.4th 240, 316 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Bolin* (1998) 18 Cal.4th 297, 335–336 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127]); and (4) neither the federal nor state Constitution requires intercase proportionality review. (*People v. Panah, supra,* 35 Cal.4th at p. 500; *People v. Clark* (1993) 5 Cal.4th 950, 1039 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

### 5. *Cumulative Error*

Defendant contends the cumulative effect of error during the penalty phase requires reversal of the death judgment. As previously noted, because he has demonstrated few errors, and we have already found such errors or possible errors harmless, either individually or cumulatively, "we likewise conclude that their cumulative effect does not warrant reversal of the judgment." (*People v. Panah, supra,* 35 Cal.4th at pp. 479–480.)

## III. Disposition

For the reasons stated, we affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Davis, J.,[*] concurred.

Appellant's petition for a rehearing was denied March 15, 2006. George, C. J., did not participate therein.

---

[*]Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.